UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. _____

TINA DOWELL, on behalf
of herself and all others similarly
situated,

         Plaintiffs,

vs.

**(JURY TRIAL DEMAND)**

ARISE VIRTUAL SOLUTIONS, INC.,
individually and as successor to
WILLOW CSN,

         Defendant.

_____/

## VERIFIED COMPLAINT

Plaintiff Tina Dowell ("Plaintiff" or "Dowell"), by her undersigned counsel, and, for herself and on behalf of all persons similarly situated former and current employees (collectively "Plaintiffs" or "Covered Employees") of Defendant Arise Virtual Solutions, Inc. ("Arise" or "Defendant"), for her Complaint against Arise, alleges as follows:

## INTRODUCTION

1.      Arise profits by providing its corporate customers a "virtual employment" alternative to hiring, training, and paying employees. Arise's "virtual employment" alternative, however, amounts to a knowing misclassification of Arise's workers – who are Arise's employees (sometimes "Covered Employees" or "Plaintiffs") - as "independent business owners" ("IBOs"), "virtual service corporations" ("VSCs"), "CyberCorps," "Client Service Professionals" ("CSPs"), "companies," and "partners" among the medley of misleading

descriptions Arise uses in conjuring the transparent illusion that Arise's closely-controlled workers are not Arise's employees. All these descriptions are purely pretexts that mischaracterize employees that Arise wants to style as "independent contractors" in an illegal end run around the United States labor laws, including, in particular for purposes of this Complaint, the federal minimum wage requirements in the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA").

2.      In using the "independent contractor" fig leaf to cover up its blatant violation of the bedrock legal requirement mandating that employers pay their employees a minimum wage, Arise violates the nation's federal employment laws, aids and abets Arise's customers' violations of the employment laws, and cheats taxing authorities out of required tax payments companies must make on behalf of and in connection with their employees.

3.      Arise's keystone business offering, "virtual employment," elevates flimsy legal form over true economic substance at the expense of the Plaintiffs and the entire United States economy.

4.      Plaintiffs bring this case as a collective action under Section 216(b) of the FLSA to redress the wrongs they have suffered and recover the compensation to which they are legally due.

5.      "Covered Employees" for purposes of this Complaint means all individuals who, whether described as IBOs, VSCs, partners, CyberCorps, companies, corporations or some other supposed variant of independent contractors, in the three years before the filing date of this Complaint, performed work for Arise's customers through Arise and who did not receive the federally guaranteed minimum wage for their work.

## PARTIES

6.     Arise is a corporation organized and doing business under the laws of the State of Florida and with a principal place of business at 3450 Lakeview Drive, 6th Floor, Miramar, Florida, 33027. Arise, by its own admission, is engaged in interstate commerce. Arise's annual gross volume of sales made or business done is not less than $500,000.

7.     Arise is an "employer" within the meaning of the FLSA, 29 U.S.C. § 203(d). Arise is a "corporation," which makes Arise a "person" under FLSA, 29 U.S.C. § 203(a). Under the FLSA, 29 U.S.C. § 203(d), an "employer" includes "any person acting directly or indirectly in the interest of an employer in relation to an employee." Arise acts directly and/or indirectly as an employer in relation to the Covered Employees, who are Arise's employees.

8.     Arise is an "enterprise" within the meaning of the FLSA, 29 U.S. C. § 203 (r). "The related activities performed" by Arise for its customers, which Arise collectively calls "virtual business process outsourcing," are performed by and through a "unified operation" that Arise says it developed, and which Arise implements and closely and systematically monitors. Arise's unified business operation is under Arise's systematic "common control" by and through Arise personnel "for a common business purpose." Arise's unified operation is under the common control of a senior management team led by co-Chairpersons Angela Selden and John A. Meyer. Both are also members of Arise's Board of Directors. Arise's Board includes, besides Ms. Selden and Mr. Meyer: Alon Krashinsky; Thomas J. Neff; Mark Hodges; Jeff Trandahl; J. Michael Cline; and Alex Mandel.

9.     According to a January 18, 2007 Press Release ("Jan. 2007 Press Release"), "[h]ome agent provider Willow CSN announced today that it has changed its name to Arise."

10.     As the Jan. 2007 Press Release makes clear, Arise is the successor in interest to Arise. Arise assumed and continued Willow's business model, assets, and liabilities. Willow's enterprise continued fundamentally unchanged as Arise's enterprise. The Willow – to – Arise name change transaction effected no material changes in Willow's business other than the name change. Arise continued the same product line that Willow offered Arise continued the same operations Willow had maintained. Arise is Willow for all practical, legal, and equitable purposes.

11.     Plaintiff is an individual with a residence at 10737 N.W. 11th Street, Pembroke Pines, FL 33026. Plaintiff Dowell has worked for Arise or its predecessors since October 1999, answering calls from Arise's customers' own members and clients. Plaintiff Dowell has never been paid the federally required statutory minimum wage for her work for Arise and its customers.

## JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction over this action under 29 U.S.C. § 216(b), and, therefore, under 28 U.S.C. § 1331. Plaintiffs allege Arise violated, *inter alia,* the Fair Labor Standards Act ("FLSA") minimum wage payment requirements.

13.     This Court also has jurisdiction under 28 U.S.C. § 2201(a), the Declaratory Judgment Act, to declare the rights of, and legal relations between, the Plaintiffs and the Defendant.

14.     This Court's exercise of jurisdiction will comport with fundamental due process notions of fair play and justice. Arise's voluntary, repeated and systematic business dealings in this jurisdiction demonstrate that Arise should reasonably expect to be brought into Court in this jurisdiction.

15.     Venue is proper in this Court under 28 U.S.C. § 1391 (b)(1) because Arise is a corporate resident of this district, over whom this Court has personal jurisdiction.

16.     Venue is also proper in this Court under 28 U.S.C. § 1391(b)(2) because Arise conducts substantial, continuing and systematic business activities in this District and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTS

### Arise's Employee Outsourcing Business

17.     An April 20, 2012, Arise Press Release ("Press Release") describes Arise's business offering:

> virtual business process outsourcing (BPO) solutions for brands seeking to improve business strategy and results through enterprise virtualization. Arise customizes and delivers virtual BPO services, including high quality voice, e-mail, chat, social media and mobile customer service sales, technical support, and back office services. Virtualization leverages untapped resources using cloud-based, secure technology to variabilize work without barriers – in any location – to deliver superior results at a lower cost.

18.     Arise's business offering consists almost entirely, if not entirely, of the Covered Employees, whom Arise calls "independent businesses...more than 25,000 entrepreneurial, client support professionals in the United States, Canada, the United Kingdom and Ireland." *See* Press Release.

19.     Arise markets its virtual employment model to major corporations, such as the American Automobile Association, Apple, Disney, Carnival Cruise Lines and others needing, for example, call center staffing but desiring to avoid hiring, training, and paying wages and benefits to actual employees.

20.     Further describing how Arise's array of "independent businesses" with more than 25,000 "professionals" can help Arise's corporate clients, Arise's Press Release says:

> Arise makes it possible for independent business owners to be productive from home by using the company's advanced proprietary technology platform and supporting business processes.  Independent businesses partnering with Arise have the freedom to manage their time, office, business finances, and staff.  The traditional 9 to 5 workplace environment is evolving and people who choose to partner with Arise desire the freedom to determine when, where, how often and for whom they work.

21.     Arise obtains what its website calls Arise's "amazing resource pool" of what are in every meaningful respect Arise's employees by promoting itself as providing a meaningful earning opportunity to stay-at-home parents and others who desire to work from home. For example, the Press Release states, in pertinent part:

> Arise Virtual Solutions, Inc., the leading global provider of virtual business solutions, announced it has thousands of work-from-home opportunities for stay-at-home mothers looking for flexible hours, a family work-life balance and the opportunity to earn money.  With the current public debate swirling around the choice facing women to either work or stay at home to raise a family, a line has been drawn in the sand that seems to suggest an either/or position. Noticeably absent in this dialogue is the rapidly growing trend of Americans, particularly women with children, who are choosing to meld their personal and professional lives and work from home.

22.     Arise essentially supplies at-home workers to large companies needing call center staffing but who want to avoid recruiting, hiring, training and paying employees to staff call centers and service customers.

23.     Arise's website touts Arise as:

> sav[ing] our clients millions of dollars in up-front recruiting and training delivery expenses because Arise and its Client Support Professionals absorb the certification costs, eliminating the salaries for instructors and payments for those being certified.

24.     Arise's website further explains how Arise's stay-at-home mother employment force saves Arise's corporate customers money:

> Clients pay only for productive talk minutes.  Our business model pays Client Support Professionals only for productive minutes and creates premium service fee arrangements for the top performers.  Clients do not pay for any unproductive periods, such as call wait time, breaks, lunch or vacation time, or most certification time.

25.     Further elaborating on how its clients save money by using Arise's scheme of treating employees as if they were truly independent contractors, Arise's website says:

> Arise eliminates enormous expenses tied to the practice of shift-scheduling.  Brick-and-mortar firms schedule agents in time shifts. In our model, clients pay only for minutes of service regardless of how many Client Support Professionals are scheduled.   This means no missed sales and service opportunities, no over-staffed idle time.

26.     Neither Arise nor Arise's customers pay for all the time that the Covered Employees, Arise's "Client Service Professionals," work.

### Arise's "Independent Business Owners ("IBOs"), "Virtual Services Corporations" ("VSCs") and "Client Service Professionals" ("CSPs") are Arise's Employees

27.     The factual substance, the economic and practical reality of Arise's model, bears no meaningful relationship to Arise's self-described model of Arise contracting with IBOs or VSCs, which in turn supposedly supply their own employees, "CSPs," to service Arise's clients.

28.     Under the law, and in fact, the Covered Employees, regardless whether they are IBOs, VSCs, CyberCorps, partners or other variants of what Arise wants to style as independent contractors, are not independent contractors but Arise employees.

29.     Arise's descriptions of its workforce as "stay-at-home mothers" and, in the same strained breath, as "independent businesses," "entrepreneurial, client-support professionals" and "partners" reveals the truth contradicting Arise's artificial description of stay-at-home mothers, working from home, at kitchen and dining room tables, as IBOs, VSCs and CSPs.

30.     Plaintiffs' corporate status, lack of W-2 paychecks, and work-from-home positions do not, just as their contracts with Arise do not, under established law, negate the Plaintiffs' status as Arise's employees.

31.     Arise's "stay-at-home mother" employees provide services that are integral to Arise's business.  Without these employees, Arise would have nothing to offer its corporate customers.  In short, "no employees, no Arise."

32.     Arise contracts with its workers, creating a permanency in the employment that is absent from genuine independent contractor relationships.

33.     Arise's employees invest very little in facilities and equipment.  They work from home, at kitchen tables and dining room tables. After paying Arise for training required for each client Arise services, these employees use their home computers and telephones to service Arise's corporate customers.

34.     Arise's employees' very modest investment in facilities and equipment  separates Arise's employees from true independent contractors.  Genuine independent contractors typically have relatively more significant investments in their own facilities and equipment.

35.     Arise specifies in detail the "CyberCorp Workstation Requirements" for its workers.  These requirements have included minimum processor levels – e.g., "700 MHZ or better" – "DSL or Cable Modem" with "[a] back up ISP" that "can be a dial up as long as it is not the same provider as your primary ISP." Telephones must have "Hold, Flash and Headset functionality."  The Covered Employees must use a dedicated telephone line with no additional features, such as call waiting or telefacsimile capability.  Prohibited from using a Voice Over Internet Protocol ("VOIP") headset, the Covered Employees are required to use a headset equipped with a noise filter. For "installed software," Arise mandates "Windows 2000 or

Windows XP w/latest service packs and security patches installed." "Anti-Virus Software" necessitates the IBO have "[l]atest edition of Symantec's Norton Anti-Virus, McAfee or other reputable Anti-Virus Software…." IBOs' web browsers must be "Internet Explorer 6.0 w/latest patches and updates."

36.   In a May 3, 2004 "News Flash," Arise's predecessor, Willow, underscored its exactingly close operational control, which Arise has continued, over exactly how the Plaintiffs were to do their jobs:

> It has come to our attention that there seems to be a growing number of CyberCorps that have fax machines or call waiting services on the phone line with which customer calls are serviced.  You are not allowed to have fax machines, answering machines, call waiting, or any additional services on this phone line. ….[t]his would be a good time to review that entire "Additional Requirements" page, to see if you are in compliance with all the Willow requirements!

37.   Willow provided, as Arise does now, "Workstation Quick Tips" that tell workers how to solve problems such as the inability to get a "Willow [now Arise] Support Specialist on the phone," to "get to Wilnet page or any Client Application" or if the IBO's "computer is running very lslow and/or freezing."

38.   Any employees an Arise IBO hires must also receive Arise-approved training specific to the customer(s) for whom such IBO employee is going to take calls.

39.   Arise centrally dictates and controls the Covered Employees' opportunities for profit and loss by controlling when they work, how much they work, whether they get paid at the higher rate for performance Arise alone decides merit such increased pay, or at the lower rate for what Arise alone determines is sub-stellar performance.   For example, Arise monitors its workers' "Schedule Adherence" as a "performance metric on a monthly basis for each of your assigned employee CyberAgents." Arise "set Schedule Adherence at a minimum of 95% and a Release Ratio of not more than 5%." In other words, Arise's workers could not fail to handle, or

cancel, more than 5% of the hours they had agreed to be logged in to serve Arise's clients' customers.   Workers who exceeded the 5% figure "may not be considered for a client opportunity" Arise said in a July 8, 2004 "News Flash."

40.   Demonstrating the close control Arise exercises over Plaintiffs' performance of work, Willow, Arise's predecessor, warned in an April 30, 2004 "News Flash – Schedule Adherence" that "some assigned employees of CyberCorps....are regularly targeting their performance at 95% Schedule Adherence and 5% Release Ration – and not reserving the 5% leeway for true emergencies.  Thus when a bona fide emergency does arise, these CyberCorps are requesting an exception to allow them to go below 95% Schedule Adherence and/or to exceed the 5% Release Ratio."  Arise solved this problem by stating "Effective May 1st, 2004, we will not grant individual exceptions." Arise has issued the same warnings.

41.   Arise sets the parameters of the jobs on and clients for which its employees can sign up to do work.  Arise's May 1, 2011 and September 1, 2011 Statement of Work with F.W. Dowell, Inc., the company formed by Plaintiff Tina Dowell so she could work for Arise (collectively the "2011 SOWs"), includes specified "Minimum Hour Requirement" for "Select Dates;" specifies exactly who at Plaintiff Dowell's company will perform the work: "Tina D. Dowell" and further notes that Plaintiff Dowell "shall not assign" anyone else to perform the work for Arise's clients' customers; specifies "Service Level Requirements" in 11 separate categories and, underscoring the tight control Arise imposes, states: "[f]ailure to meet one or more of the Service Level Requirements by any assigned VSC ACP shall be deemed a failure to perform and may subject this SOW to immediate termination…"  The "Base Per Call Rate" depended on two separate required metrics: "Commitment Adherence" and "Quality."  True and correct copies of the 2011 SOWs are attached hereto as Composite Exhibit "A."

42.     Arise requires mandatory minimum commitments of time, including certain weekend and unfavored hours fulfillment requirements, from the Covered Employees.

43.     Arise controls the number of "talk minutes" the Covered Employees perform and for which they can be paid, by assigning and limiting the number of calls a worker receives. Arise employs a system called "Star Matic." Arise's workers weekly log on to select certain hours they wish to work within the overall parameters Arise sets. Arise's workers must select at least 15 hours for which they promise to be logged in and available to take calls for the Arise client(s) they are serving.

44.     Arise systematically and constantly monitors its employees' performance, cataloguing calls handled, the quality of call handling and other metrics. For example, a July 18, 2012 email from Nila Clark to Arise's "IBOs," attaching a "call recording" reflecting a customer service professional's "lack of empathy and comprehension of the member's situation," reflects not only Arise's close monitoring and critiquing of its employees' performance, but Arise's control over how the employees perform: "In spite of *all of our reminders that we send daily* and *all of the education that we provide* regarding the safety of our members…." (Emphasis added.) Showing Arise's own understanding that the "IBOs" are Arise's employees for all practical, operational, functional and meaningful purposes, Ms. Clark's email ended: "Please ensure that *we* take care of that member as if it were *our* own family member, so that *we* never, ever have anything like this happen again." (Emphasis added.)

45.     Arise provides scripts for its workers to follow for the beginning and ending of calls with Arise's clients' customers.

46.     When Arise's workers answer calls, they do not identify themselves as Arise employees, or even as an Arise IBO. Rather, Arise instructs its workers not to misrepresent

themselves affirmatively but to create the impression by non-disclosure that they are employees of the Arise client for whom they are taking the call.

47.     Arise requires its IBOs to take training geared to the requirements of Arise's particular clients, in the format, and at the times, Arise requires. Arise requires its workers to attend "Arise University," which consists of on-line training courses.

48.     Arise requires continual re-training in order to permit its workers to service different clients, or continuing clients whose requirements have changed.

49.     Arise requires separate "Statements of Work" ("SOWs") for each assignment its workers perform, specifying precisely the who, what, when, where, and how each such assignment must be performed.  SOWs are typically issued three times a year.

50.     Arise's workers exercise no meaningful discretion over the methods by which they service Arise's customers. Arise requires its workers to follow a specific protocol, in a particular sequence, tailored tightly to the particular client's needs.

51.     Arise does not require its IBOs to work only for Arise.  But as Arise's website proclaims, Arise offers work primarily to "stay-at-home-mothers" whose time is subject to numerous demands and who have only limited hours available for work each day. In working for Arise – and managing what Arise calls the "work-life" balance – these workers have no time left to work for any other employers but Arise.

52.     Arise controls and calibrates the Covered Employees' pay, depending on Arise's evaluation of the Covered Employees' performance.  For example, employees meeting or exceeding a 90% performance standard receive a nickel more per call handled than employees who do not.

53.     Arise monitors its workers calls, using this monitoring to determine pay rates and to measure the overall job performance of the Covered Employees.

54.     Arise does not pay its workers for all the time they are logged in to service Arise's customers, or for training time.  Arise pays, at most, for what it calls "ATT" or "actual talk time."

55.     Arise's employees do not control the method by which they do their work.  They must follow the training protocols and strictures Arise imposes for Arise's various customers.

56.     Arise's employees cannot initiate novel business processes.  To the contrary, deviating from Arise's mandated protocols can trigger sanctions up to and including termination.

57.     Arise's employees cannot deviate from Arise's mandatorily prescribed formulae for handling calls.

58.     Arise's employees exercise virtually no independent judgment.  They do not initiate programs for dealing with calls, nor are they allowed to modify such programs.

59.     Arise's employees answer calls, and are required mechanistically to follow the Arise-required steps for resolving whatever issues the callers present.

60.     Arise's description of its employees as "independent businesses" and similar variants of independent contractors fundamentally misrepresents their status and elevates form far above substance in an effort to change an economic and practical reality – that the Covered Employees are Arise's employees - into a different legal reality that would absolve Arise of paying the federally guaranteed minimum wage to the Covered Employees.

61.     Arise's employees fill out forms to become, technically, "businesses" – something anyone can do, requiring simply a form and a filing fee.

62.     Arise's employees do not have staffs, legal departments, human resources personnel, financial or treasury departments, training personnel, accountants, or any of their own personnel in most cases.

63.     Arise's fictional "independent business partners" are in legal, practical, economic and operational terms indistinguishable from Arise's employees – except that they receive neither W-2 paychecks, nor benefits, nor any of the protections legally available to W-2 employees.  Arise also avoids paying any taxes on such employees.

64.     Arise establishes and controls all parameters and requirements for performance and payment governing the work of these "independent businesses."

65.     Exemplifying Arise's micromanagement and control over Plaintiffs and their work is the "Statement of Work" that Plaintiff Dowell entered with Arise ("the 2012 SOW"), as of April 1, 2012.  A true and correct copy of the 2012 SOW is attached hereto as Exhibit "B."

66.     Substantively similar, if not identical, in many respects to the 2011 SOWs, the 2012 SOW also demonstrates that Arise acts as and is the Plaintiffs' employer, by  establishing, controlling, monitoring, evaluating and altering, in the exercise of Arise's sole discretion, all of the parameters for and performance of work by Plaintiffs.

67.     Among other contractual indicia in the 2012 SOW of Arise's complete control over the Plaintiffs' work:

        A.     Arise controls the time segments in which Plaintiffs can do their work. Section 2, "Selection of Service Shifts," states:  "Arise shall post service shift opportunities in half hour intervals on its proprietary scheduling system ('StarMatic')."

        B.     Arise mandates that Plaintiffs work at certain times.  For example, Section 2 of the 2012 SOW states: "**Five hours** of the **15 hours** of Accepted Shifts should be selected

from the following shift opportunities: **any posted service shifts on Sunday and/or Saturday.**" (Emphasis in original.)

        C.      Further confirming Arise's control over the times Plaintiffs work, Section 2 of the 2012 SOW requires Plaintiffs to perform a certain number of hours of work on certain holidays: "For the Select Dates stated in Table 1, below, the **Minimum Hour Requirement** must be serviced in those days." (Emphasis in original.)  Table 1 specifies "Minimum Hour Requirements" for "Select Dates;" "seven and one-half hours" for "Saturday, April 7th and/or Easter Sunday, April 8th and/or Monday, April 9th;" "ten hours" for "Sunday, May 27th and/or Memorial Day, May 28th and/or Tuesday, May 29th;" and seven and one-half hours "Saturday, June 16th and/or Father's Day, June 17th and/or Monday, June 18th.

        D.      Arise controls who, in particular, by name, will perform the Plaintiffs' work.  Section 2, "Selection of Service Shifts," states: "Such service shifts shall only be accepted by Company in the name of the CSP Affiliate that has been assigned by Company to actually service any such service shifts."  The SOWs, such as the 2012 SOW, specifically identify by name the CSP Affiliates approved to work on a particular Arise client's calls.  For example, the 2012 SOW identifies the "CSP Affiliate" "assigned by Company to provide Services on the Client's Application under this SOW" as "Tina D. Dowell."  The 2012 SOW further states: "Company shall not assign any other CSP Affiliate without first notifying Arise in writing of the name of such CSP Affiliate and obtaining from Arise all required Login Codes for such CSP Affiliate to provide services."

        E.      Demonstrating Arise's control over Plaintiffs through restrictions on their other opportunities, Section 3 of the 2012 SOW states: "During the term of this SOW, the

Company represents and warrants that the CSP Affiliate does not currently work directly for or provide any contracted services to Client's outsource vendors who provide ERS service."

   F. As Section 4, "Service Level Requirements," of the 2012 SOW shows, Arise specifies "Service Level Requirements" in percentage terms across 14 different metrics. Showing Arise's control of the performance of the work – as well as when and by whom – "Arise may modify the Service Level Requirements specified herein, at any time, upon reasonable written prior notice to Company."

   G. Underscoring Arise's dominating control over the Plaintiffs' work, Section 4 of the 2012 SOW also provides: "Arise, shall have the right, at its sole discretion, to terminate this SOW and/or to revoke or suspend a CSP Affiliate's certification, if the CSP Affiliate fails to meet one or more of the Service Level Requirements. " Section 4 also states:

> In the event that the Commitment Adherence percentage for any CSP Affiliate falls below 90% for three consecutive weeks or falls below 90% during any rolling 60 day period, in addition to any other remedies provided to Arise under this SOW or the Agreement, Arise, at its sole discretion, shall have the right to disable the login codes ("Login Code Disabling Event") for this or any other SOW that is outstanding between Arise and Company under this Client Application for a period of one week.  This will allow the Company to implement whatever policies and/or controls that it deems necessary and appropriate to enable Company to meet its Commitment Adherence obligations.

   H. Arise dictates, at its sole discretion, the formula by which Plaintiffs will be paid.  Section 6, "Company Revenue," of the 2012 SOW gives Arise two choices.  Section 6, Paragraph (b)(i) empowers Arise to calculate  the "Base Per Call Rate" "based on Table 2." Table 2 provides a "Base Per Call Rate" of $1.17, if Plaintiffs meet the corresponding stated metric: "Commitment Adherence is = or > 90% and Quality is = or > 85%."  Table 2 stipulates a $1.05 "Base Per Call Rate" of $1.05, if Plaintiffs meet the corresponding stated metric: "Commitment Adherence is < 90% and/or Quality is  <  85%."

I.      Arise gives itself another choice of payment formula, which Arise can choose to use at its sole discretion. According to Section 6, Paragraph (b)(ii): "Alternatively, Arise may use the base service rate of **$10.00** per hour (the '**Alternate Base Rate**') multiplied by the total number of hours serviced by the CSP Affiliate during the Invoice Period." (Emphasis in original.)

J.      As Section 6, Paragraph b (iii) of the 2012 SOW shows, Arise alone decides the "Commitment Adherence and Quality scores" for purposes of determining the Base Per Call Rate.

K.      Arise, not the Plaintiffs, controls when Plaintiffs are permitted to invoice for their work.  Section 6, Paragraph (a) of the 2012 SOW states: "Company shall be entitled to invoice and be paid 'Service Revenue' on a semi-monthly basis (1st to 15th and the 16th to the end of the month) (hereinafter the 'Invoice Period(s)') for servicing its Accepted Shifts during the Invoice Period."

L.      Arise's thorough control of the Plaintiffs' work and pay appears, also, in Section 6, page 4, of the 2012 SOW:

> Notwithstanding anything to the contrary herein, the following time **shall not** be included in determining the amount of hours of service provide by Company during each semi-monthly Invoicing Period: time when any CSP Affiliate is on any Aux status for more than 5% of total staffed time as captured by Arise's systems.  Aux Statuses includes [sic]: On Break, No Answer, Authorized, Coaching, and ACW.

(Emphasis in original.)

M.      Arise dictates and administers the training Plaintiffs are required to take. Section 8, "Terms of Certification," of the 2012 SOW mandates "that the CSP Affiliate providing services under this SOW has taken and passed CSP 101 (formerly known as 'ACP 101') and the applicable Client Certification Course."

N.      No independently acquired knowledge, training, skill or experience counts for the Plaintiffs.  Among numerous other things, the Plaintiffs must represent and warrant, under Section 8(i) of the 2012 SOW that: "Arise is the sole certifying authority and therefore the granting of any certification to a CSP Affiliate, lies solely within Arise's determination that the CSP Affiliate has complied with all of the certification requirements set by Arise."

O.      Arise limits the duration of the certifications Arise requires in order for Plaintiffs to work. Section 8(ii) of the 2012 SOW states: "all certifications have a period of duration of 12 months (the 'Certification Period') and must be renewed by the CSP Affiliate upon expiration of the applicable Certification Period."

P.      Arise alone controls the contents of the certifications Arise decides are required.  Section 8(iii) of the 2012 SOW states: the certification requirements applicable to any existing certification granted hereunder may be modified by Arise, at its sole discretion, at any time during the Certification Period, without prior notice to the Company."

Q.      Bolstering Arise's strict control over the training of the Plaintiffs and the methods they use to perform their work, the Plaintiffs must certify, under Section 8(iv) of the 2012 SOW that

> as a general condition for renewal and maintaining any certification granted hereunder, Company shall ensure that CSP affiliate(s) shall comply with all continuing certification education requirements set by Arise, to include the successful completion of any courses provided and made available by Arise to the Company, for the purpose of enhancing and updating skills related to any certification held by the CSP Affiliate.

R.      Describing its "'zero tolerance' for cheating" on certification "assignments" and "exams," in another arrogation of unlimited unilateral discretionary authority under its "contract" with Plaintiffs, Arise in Section 8 reserves to its "sole discretion" "the

decision as to whether a CSP Affiliate has cheated." Arise states that, "[u]pon a determination of cheating, this SOW shall be terminated immediately."

        S.      Demonstrating its total control over the SOW's contents, the illusory nature of the SOW "contract" and the absence of any negotiation worthy of the name between Plaintiffs and Arise over the terms of the SOW and Master Agreement, Section 10, "Amendment of Terms" of the 2012 SOW states:

> Arise reserves the right to amend the terms of this SOW upon reasonable written notice to the Company, unless such notice becomes impractical due to exigent (i.e. emergencies) circumstances. The "Amendment" shall be deemed accepted by the Company unless Company sends written notice of termination of the SOW, within ten days of Company's receipt of the notice of Amendment from Arise indicating that the Amendment is not acceptable to Company and that the Company intends to terminate the SOW. Notwithstanding the aforementioned, Arise reserves the right, at any time and without prior notice to Company, to amend the terms of this SOW or change any of the procedures or policies set forth herein, which Arise determines in it's [sic] sole discretion may be required to comply with its internal security policies, or with any federal or state law, rule, or regulation.

### Fair Labor Standards Act ("FLSA") Statutory Background

68.      Enacted initially in 1938, the FLSA was meant "to protect all covered workers from substandard wages and oppressive working hours, 'labor conditions [that are] detrimental to the maintenance of the minimum standard of living necessary for health, efficiency and general wellbeing of workers.'" *Barrentine v. Arkansas-Best Freight Sys., Inc.*, 450 U.S. 728, 739 (1981).

69.      "The FLSA was designed to give specific minimum protections to *individual* workers and to ensure that *each* employee covered by the Act would receive '[a] fair day's pay for a fair day's work.'" *Id.* (citations omitted).

70.      Workers cannot waive their rights under the FLSA.

71.     Among its protections for individual workers, section 206(a) of the FLSA guarantees that covered "non-exempt" workers shall be paid a federally set minimum wage.  29 U.S.C. § 206(a).

72.     For work done before July 24, 2007, the federal minimum wage was $5.15 per hour.

73.     For work done on or after July 24, 2007 through July 23, 2008, the federal minimum wage is $8.85 per hour.

74.     For work done on or after July 24, 2008 through July 23, 2009, the federal minimum wage is $6.55 per hour.

75.     For work done on or after July 24, 2009 through the present, the federal minimum wage is $7.25 per hour.

76.     The FLSA also guarantees that covered, non-exempt workers must be paid for overtime work at a rate not less than one and one-half times their regular hourly pay rate for all hours they work over forty hours per week. 29 U.S.C. § 207(a)(2).

### Arise's Violation Of the FLSA

77.     Arise admittedly does not pay for all the hours Arise's CSPs work.   Arise specifically excludes from payment certain calls that Arise nonetheless requires its employees – the CSPs - to field and handle, from payment:

> (a) Any calls handled that were not within an Accepted Shift unless Company received prior written permission from Arise to service a shift that is not an Accepted Shift; and (b) Any calls of a duration of 30 seconds or less; or, any "System Abuse Calls," as hereinafter defined.  "System Abuse Calls" shall mean any of the following: pre-maturely [sic] terminating calls; and, calls that are unnecessarily transferred to Client.

78.     Arise also admits it does not pay for the following time its CSPs work:

[T]he following time **shall not** included in determining the amount of hours of service provided by Company during each semi-monthly Invoicing Period: time when any CSP Affiliate is on any Aux status for more than 5% of total staffed time as captured by Arise's systems. Aux Statuses includes [sic]: On Break, No Answer, Authorized, Coaching and ACW.

79.    "After call work" ("ACW"), for which Arise does not pay, includes "the amount of time spent completing work associated with a call or customer contact after the call or customer contact has been completed." Arise admits that ACW is actual work, for the benefit of Arise and its own clients, but for which Arise does not pay the Covered Employees.

80.    Arise does not pay the FLSA-mandated minimum wage to Arise's Covered Employees.

81.    Arise's own clients do not pay the FLSA-mandated minimum wage to Arise's Covered Employees.

### Plaintiff Dowell's Relationship with Arise

82.    "Michael T.," the General Counsel of Willow, Arise's predecessor, in July 2003 told Plaintiff Dowell that Arise required her to incorporate or otherwise to assume a corporate form in order to work for Arise.

83.    Plaintiff Dowell began doing business under the existing corporation of her husband Francis W. Dowell, namely, F.W. Dowell, Inc., a Florida corporation. Arise styles F.W. Dowell, Inc. as "VSC" or "Virtual Services Corporation."

84.    Plaintiff Dowell's VSC had and has no assets other than Plaintiff Dowell's willingness and ability to work.

85.    Plaintiff Dowell's VSC has no capitalization, term loan, revolving line of credit, or other sources of financing.

86.     Plaintiff Dowell's VSC has no auditor, accountant, legal counsel, human resources department, training department, working personnel or staff other than   Plaintiff Dowell.

87.     Plaintiff Dowell's VSC has no shareholders but for Plaintiff Dowell and her husband, Francis W. Dowell.

88.     Showing that Arise was hiring Plaintiff Dowell, not Plaintiff Dowell's VSC, Arise required Plaintiff Dowell to certify that she personally owned "at least 49% of the outstanding capital stock" of her corporation.

89.     Confirming the artificial nature of the "business to business" relationship image Arise sought to portray, Arise's Statements of Work, describing separate undertakings for various Arise corporate clients, required Plaintiff Dowell to warrant that she personally would "be actively involved in the direction of the business of VSC and the performance of CSR services" for Arise and would be the person actually providing services to Arise's client.  These assurances, for example, appear in both the 2011 SOWs "Statement of Work to the Arise-Virtual Services Corporation Master Services Agreement, AAA MSC NCNU_AZ Application" (Composite Exhibit "A" hereto) and in the 2012 SOW "Statement of Work to the Master Services Agreement, AAA MSC NCNU-AZ Application" (Exhibit "B" hereto).

90.     Plaintiff Dowell's VSC has never had a place of business other than Plaintiff Dowell's house where she lives with her husband and children.

91.     Plaintiff Dowell's VSC, F.W. Dowell, Inc., entered a "Master Services Agreement" with Arise or its predecessor on or about March 10, 2006.

### The 2011 Statement of Work

92.     F.W. Dowell, Inc. entered the 2011 SOWs as of September 1, 2011.

93.     The 2011 SOWs governed Plaintiff Dowell's call center work for Arise's client, the Arizona division of the American Automobile Association.

94.     Neither Plaintiff Dowell nor her corporation were represented by counsel in connection with entering the Master Services Agreement or the 2011 SOWs.

95.     Plaintiff Dowell is not a lawyer and has never studied law.

96.     Plaintiff Dowell lacked the financial means to hire a lawyer to review the multi-page, dense boilerplate of the Master Services Agreement and the 2011 SOWs.

97.     Even if Plaintiff Dowell had the money to hire a lawyer to review the Master Services Agreement and 2011 SOWs, doing so would have been economically irrational.  For a job that promised to pay a "Base Per Call Rate" of $1.05 or $1.17, depending on Arise's evaluation of Plaintiff Dowell's "commitment adherence" and "quality," hiring even an inexpensive lawyer made no sense in light of the stakes.

98.     Even if Plaintiff Dowell had the money to hire a lawyer, and did not care that the cost of the legal review was unwarranted in light of Plaintiff Dowell's expected earnings, hiring a lawyer still would have made no sense.

99.     Arise presented both the Master Services Agreement and the 2011 SOWs to Plaintiff Dowell on a "take it or leave it" basis.  Mary Bartlett, a Vice President for talent management of Arise or its predecessor in connection with the 2006 Master Agreement, and Reed Marbry, a Senior Client Results Manager, told Plaintiff Dowell that no additions, subtractions or modifications of any kind were permissible for the Master Services Agreement and the 2011 SOWs.

100.    In Section 7, Paragraph 8 on page 5 of the 2011 SOWs, "Representations and Warranties", the 2011 SOWs purports to preclude any claims by the VSC or its employees

against Arise for any compensation or benefits "that may be required by law" by providing, *inter alia* :

> That VSC will be solely responsible to compensate and provide any *benefits* that may be required by law (including, but not limited to workers' compensation and unemployment insurance) to any person employed by or deemed an assigned ACP of VSC under the any [sic] federal or state law or regulation.

(Emphasis added.)

101.   Section 7, Paragraph 9 of the 2011 SOWs further purports to emphasize that Plaintiff Dowell and any employees of her VSC are ineligible for *benefits* from Arise or any Arise client company, through the following representation and warranty:

> That any person or ACP employed by or assigned by VSC to service the Client shall not be eligible to participate in any *benefit* program maintained by Company or any client of Company.

(Emphasis added.)

102.   Section 7, Paragraph 10 of the 2011 SOWs also purports to exclude eligibility for *benefits* in the following representation and warranty:

> That VSC's Assigned ACPs shall not be eligible to receive any unemployment *benefits,* workers compensation *benefits*, or any other type of *benefits* or insurance from Company or any client of Company.

(Emphasis added.)

103.   Section 7, Paragraph 11 of the 2011 SOWs purports to exonerate Arise from liability for certain claims by its workers:

> The VSC represents and agrees that its Assigned ACPs hereby irrevocably waive any right: to assert a claim directly or indirectly against the Company or any client of Company with respect to any of the *benefits* enumerated in paragraphs 8 through 11, above; or, to assert a claim with any governmental entity or any other third party seeking to hold Company or any client of Company liable for providing any of the *benefits* enumerated in paragraphs 8 through 10, above.

(Emphasis added.)

104.   Composite Exhibit "A" to the 2011 SOWs is entitled "Waiver of Assigned VSC [Virtual Services Corporation] ACP [Arise Certified Professional] in Favor of the Virtual Services Corporation" ("Exhibit A to the 2011 SOWs").

105.   Composite Exhibit "A" to the 2011 SOWs purports to be an agreement by and between the Plaintiffs' business entities and the "Arise Certified Professionals" of those entities.

106.   Arise is not a signatory to Composite Exhibit "A" to the 2011 SOWs.  However, Paragraph 5 of Composite Exhibit "A" to the 2011 SOWs purports to give Arise enforcement rights under Composite Exhibit "A" to the 2011 SOWs:

> Company and any client of Company shall be deemed to be a third party beneficiary of this Waiver Agreement and each of them shall jointly and/or severally have the right to enforce this Waiver Agreement against each Assigned VSC [Virtual Services Corporation] ACP [Arise Certified Professional].

107.   The introductory clause of Composite Exhibit "A" to Plaintiff Dowell's 2011 SOWs is unintelligible as written:

> As a material inducement for, and in consideration of, F W Dowell INC [sic] (the "Virtual Services Corporation") agreeing to employ or assign Tina D Dowell (the "Assigned VSC ACP"), agrees to ensure that each Assigned VSC ACP acknowledges and agrees as follows:

108.   The introductory clause of Composite Exhibit "A" to Plaintiff Dowell's 2011 SOWs is apparently missing a proper noun after the parenthetical in the third line and before the phrase "agrees to ensure."

109.   The unintelligibility of the introductory clause of Composite Exhibit "A" to Plaintiff Dowell's 2011 SOWs renders that Exhibit unenforceable.

110.   Paragraphs 1-4 of Composite Exhibit "A" to Plaintiff Dowell's 2011 SOWs unenforceably parallel the unenforceable Paragraphs 8-11 of the 2011 SOWs itself:

1.      It is solely the responsibility of VSC to compensate and provide any benefits that may be required by law (including but not limited to workers' compensation and unemployment insurance) to Assigned VSC ACP.

2.      Assigned VSC ACP shall not be eligible to participate in any benefit program maintained by Company or any client of Company.

3.      Assigned ASC ACP shall not be eligible to receive any unemployment benefits, or any other type of benefits or insurance from Company or any client of Company.

4.      Assigned VSC ACP hereby irrevocably waives any right: to assert a claim directly or indirectly against Company or any client of Company with respect to any of the benefits enumerated in paragraphs 1 through 3, above; or to assert a claim with any governmental entity or any other third party seeking to hold Company or any client of Company liable for providing any of the benefits enumerated in paragraphs 1 through 3, above.

### The 2012 SOW

111.    Arise presented the 2012 SOW and its Attachments to Plaintiff Dowell on a "take it or leave it" basis.

112.    Plaintiff Dowell received no opportunity to negotiate any of the terms of the 2012 SOW and its Attachments.

113.    Section 7, Paragraph 8 of the 2012 requires Plaintiffs to "represent[ ] and warrant[ ]:"

That Company is solely responsible to compensate and provide any benefits that may be required by law (including, but not limited to workers' compensation and unemployment insurance) to any person employed    by    or deemed a CSP Affiliate of Company under any federal or state law or regulation.

114.    Section 7, Paragraph 9 of the 2012 SOW requires Plaintiffs to "represent[ ] and warrant[ ]:"

That CSP Affiliate(s) shall not be eligible to participate in any benefit program maintained by Arise or any client of Arise.

115.    Section 7, Paragraph 10 of the 2012 SOW states:

> That CSP Affiliate(s) shall not be eligible to receive any unemployment benefits, workers compensation benefits, or any other type of benefits or Insurance from Arise or any client of Arise.

116.     Section 7, Paragraph 11 of the 2012 SOW contains a nearly identical purported exoneration provision to that in the 2011 SOWs, purporting to exonerate Arise from claims for *benefits* but not for *compensation*:

> The CSP Affiliate(s) hereby irrevocably waive any right: to assert a claim directly or indirectly against Arise or any client of Arise with respect to any of the *benefits* enumerated in paragraphs 8 through 10, above; or, to assert a claim with any governmental entity or any other third party seeking to hold Arise or any client of Arise liable for providing any of such *benefits*.

(Emphasis added.)

117.     Exhibit "A" to the 2012 SOW is titled "Acknowledgement and Waiver Agreement."

118.     Like Composite Exhibit "A" to the 2011 SOWs, Exhibit "A" to the 2012 SOW also purports to be an agreement between the so-called "Independent Business" or "Company" and the named individual or "Client Support Professional" actually doing the work that the "Independent Business" or "Company" agrees to provide Arise's clients.

119.     Like Composite Exhibit "A" to the 2011 SOWs, Exhibit "A" to the 2012 SOW contains unenforceable compensation and benefit provisions, mandatory arbitration clause and class or collective action waiver that parallel similar unenforceable provisions in the SOW between Arise and the so-called "Independent Business Owner."

120.     The first paragraph of Exhibit "A" to the 2012 SOW unenforceably states:

> It is solely the responsibility of Company to compensate Client Support Professional and provide Client Support Professional with any benefits that may be required by federal, state or local law.

121.     The second paragraph of Exhibit "A" to the 2012 SOW unenforceably states:

Client Support Professional is not an employee of Arise Virtual Solutions, Inc. ("Arise") or any client of Arise.

122.    The third paragraph of Exhibit "A" to the 2012 SOW unenforceably states:

Client Support Professional is not eligible to participate in any employee compensation or benefit programs or arrangements maintained by or on behalf of Arise or any client of Arise.

123.    The fourth paragraph of Exhibit "A" to the 2012 SOW unenforceably states:

Client Support Professional is not eligible to receive any workers' compensation, unemployment or disability benefits or insurance payments, or any other similar benefits from Arise or any client of Arise.

124.    The fifth paragraph of Exhibit "A" to the 2012 SOW unenforceably states:

Client Support Professional hereby irrevocably waives any right to assert a claim directly or indirectly (whether in a court of law, in arbitration, or through a governmental agency or similar entity) against Arise or any client of Arise with respect to the matters enumerated in paragraphs 1, 2, 3 and 4 above.

### Difference Between Exhibits "A" to 2011 and 2012 SOWs

125.    The fifth paragraph of Exhibit "A" to the 2012 SOW differs from its predecessor provision in the fourth paragraph of Composite Exhibit "A" to the 2011 SOWs.  That latter, earlier provision expressly limits the purported irrevocable waiver to any claims for *benefits*.

126.    Under the 2011 SOWs and Composite Exhibit "A" to the 2011 SOWs *benefits* are distinct, different and separate from *compensation.*

127.    The fifth paragraph of Exhibit "A" to the 2012 SOW then, although unenforceable, and contradicting the text of the analogous provision in the body of the 2012 SOW itself, purports to waive claims for both *compensation* and *benefits.*

128.    The 2011 SOWs and its accompanying Composite Exhibit "A" did not purport to waive claims for *compensation,* but, rather, purported – unenforceably - only to waive claims for *benefits.*

129.    Under Composite Exhibit "A" to the 2011 SOWs, Plaintiffs did not waive claims for *compensation* against Arise.

130.    The conspicuously broader language in the purported but unenforceable waiver in Exhibit "A" to the 2012 SOW than appears in the analogous provision in Composite Exhibit "A" to the 2011 SOWs reflects Arise's realization that Composite Exhibit "A" to the 2011 SOWs did *not* waive claims for *compensation* against Arise.

### The More Detailed Mandatory Arbitration and Class Action Waiver in Exhibit "A" to the 2012 SOW

131.    The sixth paragraph of Exhibit "A" to the 2012 SOW recites the purported "binding arbitration" agreement of Plaintiffs' corporate entities and Arise, then says:

> In consideration of Arise's agreement to arbitrate disputes and claims it may have against Client Support Professional and for other good and valuable consideration, Client Support Professional agrees to arbitrate any and all disputes or claims that he or she may have against Arise or any client of Arise as set forth below in Paragraphs 7 through 9.

132.    Substantially more detailed than Composite Exhibit "A" to the 2011 SOWs, the seventh through ninth paragraphs of Exhibit "A" to the 2012 SOW nonetheless reflect an equally unenforceable, substantively and procedurally unconscionable, coercive and adhesive "agreement" for mandatory, binding arbitration.  Among other things, the seventh paragraph of Exhibit "A" to the 2012 SOW states:

> Company and Client Support Professional hereby agree to resolve any and all disputes or claims each may have against the other, and Client Support Professional hereby agrees to resolve any and all disputes that he or she may have against Arise or any client of Arise (including but not limited to claims for wages or other compensation due; claims for breach of any contract or covenant, express or implied; personal injury, defamation or other tort claims; claims for discrimination, including but not limited to discrimination based on race, sex, religion, national origin, age, marital status, sexual orientation, handicap, physical or mental disability or medical condition; claims for benefits; and claims for violation of any federal, state or other governmental constitution, law, statute, ordinance, regulation, public policy or provision of common law) by binding arbitration….

133.    The paragraphs of Exhibit "A" to the 2012 SOW are not numbered, but the seventh through ninth unnumbered paragraphs all concern the purported mandatory arbitration.

134.    The supposed consideration for the Client Service Professional's claimed "agreement" to arbitrate is illusory, and, in any event, insufficient to support the claimed agreement to the mandatory arbitration provision.

135.    Echoing the 2011 and 2012 SOWs themselves, Exhibit "A" to the 2012 SOW states, *inter alia*: "Questions of arbitrability (that is whether an issue is subject to arbitration under this Agreement) shall be decided by the arbitrator."

136.    The tenth paragraph of Exhibit "A" to the 2012 SOW is captioned "Class Action Waiver."  Like the unenforceable parallel provision in Section 9.4 of the 2012 SOW itself, this tenth paragraph of Exhibit "A" to the 2012 SOW purports broadly, and unenforceably, to preclude any sort of class or collective action in court or in arbitration:

> By signing this Agreement, all parties waive their right to commence, to become a party to, or to remain a participant in, any group, representative, class, collective, or hybrid class/collective action in any court against one or more other parties to this Agreement, Arise or any client of Arise.  Further, the parties waive their right to commence, to become a party to, or to remain a participant in, any group, representative, class, collective, or hybrid class/collective action claim in arbitration or any other forum against one or more other parties to this Agreement, Arise or any client of Arise.  The parties agree that any claim by or against any party to this Agreement shall be heard in arbitration without consolidation of such claim with any other person [sic] or entity's claim.

137.    Echoing the express caveats in the 2011 SOWs and in its Composite Exhibit "A", and in the 2012 SOW, Exhibit "A" to the 2012 SOW also reflects Arise's recognition, at a minimum, of the legal dubiousness of its coercive boilerplate, in tiny print, over many pages of dense legalese, purporting to mandate arbitration and to exclude class or collective by the micro-

"business" owners Arise misleadingly puffs up as "Independent Business Owners," and "Virtual Services Corporations:"

> All parties agree that this Agreement does not limit a party's right to initiate an      action in state or federal court challenging the enforceability of the group, representative, class, collective or hybrid action waiver set forth herein….Company reserves the right to oppose such a challenge to the enforcement of this Agreement.

138.    The SOW's reservation of rights to oppose such a challenge to "the enforceability of the group, representative, class, collective or hybrid action waiver " is nonsensical and unenforceable.  Both the 2012 SOW, and Exhibit "A" to the 2012 SOW define "Company" as F.W. Dowell, Inc., the "Independent Business Owner," namely, the Plaintiff.  The Plaintiffs do not oppose any challenge to enforcement of the Agreement.  Plaintiffs themselves make exactly such a challenge, not just to the purported class or collective action waiver, but to the supposedly mandatory binding arbitration requirement.

139.    Arise alone drafted and is responsible for the 2011 and 2012 SOW's content.

140.    All gaps, conflicts, patent ambiguities and latent ambiguities must be construed against Arise and in favor of the Plaintiffs.

141.    Section 7, Paragraph 8 of the 2011 and 2012 SOWs expressly differentiates between "compensation" and "benefits."

142.    The 2011 and 2012 SOW's purported exoneration of Arise in Section 7, Paragraph 11 extends, in plain language, only to claims for "benefits" and does not reach claims for "compensation."

143.    Established law prohibits and construction or interpretation of Section 7, Paragraph 11 of the 2011 and 2012 SOWs that imports by fiat an important word that is not there - "compensation."

144.    Any claimed exoneration of Arise from claims for "compensation" is not only unsupported by the language that Arise itself drafted and required Plaintiffs to sign, but is legally invalid.

145.    Among its other deficiencies, Section 7, Paragraph 11's purported exoneration results from procedural unconscionability.  Plaintiffs had no opportunity whatsoever to negotiate or bargain over the "take-it-or-leave-it" terms in the SOWs, including, but not limited to, the mandatory arbitration and class action waivers.  Arise is a large corporation doing business in 50 states, with a board of directors, managers, and the means to hire an array of professionals. Plaintiffs are, by Arise's own admission, generally stay-at-home mothers who have no bargaining power against Arise, or the means to acquire such power.

146.    Section 7, Paragraph 11's purported exoneration clause is substantively unconscionable and coercive.  Enforcing the mandatory binding arbitration and class action waiver will mean Plaintiffs never bring their claims.  The SOWs do not provide for payment of the Plaintiffs' arbitration costs or legal fees.  The SOWs do not give the Plaintiffs a choice over which arbitral rules will govern.  The SOWs do not disclaim any claims Arise might make for legal fees or other remedies against the Plaintiffs.  The purported class action waiver virtually ensures that Plaintiffs will not be able to find competent counsel to represent them in arbitration. Individual plaintiffs' claims are small compared to the cost of litigating these claims.  Only by aggregating numerous individual claims will the Plaintiffs be able to attract legal counsel to represent them, in order to make the case economically rationale.   Arise's SOW's purported waiver of the Plaintiffs' FLSA rights is illegal under the FLSA itself.  FLSA rights are non-waivable.

147.    Section 7, Paragraph 11's purported exoneration clause is unsupported by consideration and illusory.    Arise purports to require Plaintiffs to forfeit their federally guaranteed statutory rights to be paid a minimum wage for their work; to forfeit their federally guaranteed statutory rights to be paid for all of the time that they work; to forfeit their right to join their claims with those of other similarly situated Arise workers; and to forfeit their right to bring their claims in court, for the single off-setting "consideration" of getting the chance to request – but not necessarily to receive – a certain number of shifts of call center work.

148.    Section 9 of the 2011 SOWs, "Arbitration of Claims," purports to mandate "binding arbitration" for "any and all disputes or claims each [party] may have against the other."

149.    Section 9 of the 2012 SOW, entitled "Arbitration of Claims; Class Action Waiver," also purports, in subsection 9.1, to require "binding arbitration" of "any and all disputes each [party] may have against the other."

150.    Section 9 of the 2011 SOWs, "Arbitration of Claims," also purports to contain the parties' express agreement "that the Federal Arbitration Act governs the enforceability of any and all of the arbitration provisions of this Agreement," and to assign "[q]uestions of arbitrability" to "the arbitrator."

151.    Section 9.2 of the 2012 SOW similarly purports to contain the parties' express agreement "that the Federal Arbitration Act governs the enforceability of any and all of the arbitration provisions of this SOW" and identically purports to assign "[q]uestions of arbitrability" to "the arbitrator."

152.    Section 9 of the 2011 SOWs, "Arbitration of Claims," purports to prohibit "any group, class, collective, or hybrid class/collective action in any court against one or more other

parties to this Agreement." This purported bar extends to the arbitration the 2011 SOWs says is mandatory: "Further, the parties waive their right to commence, to become a party to, or to remain a participant in, any group, class, collective or hybrid class/collective action claim in arbitration or any other forum."

153. Section 9.4 of the 2012 SOW is captioned "Class Action Waiver." This provision, like its 2011 SOWs predecessor, purports to be the parties' agreement to

> waive their right to commence, to become a party to, or to remain a participant in, any group, representative, class, collective, or hybrid class/collective action in any court against one or more other parties to this SOW, or any Arise Client. Further, the parties waive their right to commence, to become a party to, or to remain a participant in any group, representative, class, collective, or hybrid class/collective action claim in arbitration or any forum against one or more parties to this SOW or any Arise client. The parties agree that any claim by or against any other party to this SOW or any Arise Client shall be heard in arbitration without consolidation of such claim with any other person or entity's claim.

154. Section 9 of the 2011 SOWs, "Arbitration of Claims," and Section 9.4 of the 2012 SOW both preserve the Plaintiffs' right to challenge the validity of the so-called "class action waiver:" "All parties agree that this Agreement does not limit any party's right to initiate an action in state or federal court challenging the enforceability of the group, class, collective, or hybrid action waiver set forth herein." In almost identical language the 2011 and 2012 SOWs expressly preserve Arise's right "to oppose such a challenge."

155. Under governing law, Plaintiff Dowell remains free, the SOWs and Master Agreement notwithstanding, to bring her FLSA claims in this Court, in a class or collective action.

156. Under governing law, Plaintiff Dowell has not "clearly and unmistakably" expressed her informed consent mandatorily to submit threshold questions of arbitrability to an arbitrator.

157.    Under governing law, Plaintiffs retain, and have not waived their rights to bring the claims in this Complaint to this Court for adjudication on a class or collective litigation basis, whether as an opt-in FLSA collective action or any other form of group litigation.

158.    Among other things, mandatory arbitration with a class/collective action waiver is invalid where (a) the plaintiffs' claims are based on federal law, as Plaintiff Dowell's claims are based on the FLSA; (b) the arbitration clause was produced, as it was here, by procedural unconscionability in which the party seeking to enforce the arbitration clause has and exercises substantially greater bargaining power and knowledge than the party against whom enforcement is sought; and (c) enforcement of the arbitration clause is substantively unconscionable because it would result in the parties against whom enforcement is sought not bringing their claims at all because the dollar value of the claims is relatively small weighed against the high cost of litigation, whether in arbitration or in a court proceeding.

## CAUSES OF ACTION

### COUNT I – ACTION FOR DECLARATORY RELIEF THAT THE SOW'S MANDATORY ARBITRATION CLAUSE, AND CLASS/COLLECTIVE ACTION WAIVER, ARE INVALID AND UNENFORCEABLE

159.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs "1" through "158" above, with the same force and effect as if set forth fully herein.

160.    An actual, present and justiciable controversy exists between the  Plaintiffs and Defendant concerning the validity of the  purported mandatory arbitration in Section 9 of the SOW of "any and all disputes or claims" that the Plaintiffs and Defendant "may have against the other."

161.   An actual, present and justiciable controversy exists between the Plaintiffs and Defendant concerning the validity of the SOW's purported express agreement, in Section 9 of the SOW, that "[q]uestions of arbitrability…shall be decided by the arbitrator."

162.   An actual, present and justiciable controversy exists between the Plaintiffs and Defendant concerning the validity of the Plaintiff's purported waiver in Section 9 of the SOW of "their right to commence, to become a party to, or to remain a participant in any group, class, collective or hybrid class/collective action in any court against" the Defendant.

163.   An actual, present and justiciable controversy exists between the Plaintiffs and Defendant concerning the validity of the Plaintiff's purported waiver in Section 9 of the SOW of "their right to commence, to become a party to, or to remain a participant in any group, class, collective or hybrid class/collective action in arbitration or any other forum."

164.   The Defendant has expressly consented in Paragraph 9 of the SOW to this Court exercising its jurisdiction to decide "the enforceability of the group, class, collective, or hybrid action waiver set forth" in the SOW.

165.   An actual, present, and justiciable controversy exists between the Plaintiffs and Defendant concerning whether Plaintiffs are employees of the Defendant for purposes of the FLSA.

166.   An actual, present, and justiciable controversy exists between the Plaintiffs and Defendant concerning whether Defendant is Plaintiffs' employer for purposes of the FLSA.

167.   An actual, present, and justiciable controversy exists between the Plaintiffs and Defendant concerning whether Defendant has any legal or other duty or obligation to compensate Plaintiffs under any federal statute, law, or regulation.

168.    Without prejudice to, and reserving all their rights to litigate their other claims in this Complaint, Class Plaintiffs request the Court issue its declaratory judgment that:

A.    This Court has subject matter jurisdiction to adjudicate and determine all of Plaintiffs' claims;

B.    This Court has personal jurisdiction to adjudicate and determine all of Plaintiffs' claims;

C.    Venue is appropriate and proper in this Court;

D.    That the SOW's provisions purporting to require mandatory binding arbitration "any and all disputes or claims" that the Plaintiffs and Defendant "may have against the other" is invalid or otherwise no bar to the litigation, on the merits, of all of Plaintiffs' claims in this court;

E.    That the SOW's provisions purporting to reflect the parties' agreement that "[q]uestions of arbitrability...shall be decided by the arbitrator" is legally invalid or otherwise no bar to this Court's consideration and adjudication of any and all questions of arbitrability without submission or reference to any arbitrator(s);

F.    That the Plaintiffs' purported waiver in the SOWs of "their right to commence, to become a party to, or to remain a participant in any group, class, collective or hybrid class/collective action in any court against" the Defendant is legally invalid, not binding, or otherwise no bar to the full adjudication of all of Plaintiffs' claims in this Court.

G.    That the Plaintiffs' purported waiver in the SOWs of "their right to commence, to become a party to, or to remain a participant in any group, class, collective or hybrid class/collective action in arbitration or any other forum" is legally invalid, not binding, by

its terms inapplicable to any claims or disputes Plaintiffs have against Defendant under the FLSA, and is otherwise no bar to the full adjudication of all of Plaintiffs' claims in this Court.

H. That the Plaintiffs are the Defendant's non-exempt employees for purposes of the FLSA;

I. That the Defendant is a covered employer under the FLSA;

J. That the Defendant is the Covered Employees' employer under the FLSA;

K. That for the period covered by this Complaint the Defendant was obligated to pay Plaintiffs the then-applicable federally guaranteed minimum wage.

## COUNT II - VIOLATION OF FAIR LABOR STANDARDS ACT FOR NOT PAYING FEDERALLY MANDATED MINIMUM WAGE TO EMPLOYEES

169. Plaintiffs repeat and reallege each and every allegation contained in Paragraphs "1" through "158" and "160" through "168" above, with the same force and effect as if set forth fully herein.

170. Plaintiffs, the Covered Employees, are "employees" of Arise under the FLSA.

171. Arise is an employer under the FLSA because, among other things, Arise is an enterprise engaged in interstate commerce and the Covered Employees are engaged in performing Arise's services in that interstate commerce.

172. As Arise's employees under the FLSA, the Covered Employees, are entitled to receive the federally guaranteed minimum wage.

173. Arise did not pay the federally guaranteed minimum wage to the Covered Employees.

174. Arise intentionally structured its business model to avoid paying the federally guaranteed minimum wage to the Covered Employees, and touted that model as a cost-saving to, and competitive advantage for, Arise's own customers.

175.    Arise's boilerplate but error-filled Master Agreement and SOWs reflect Arise's deliberate, intentional, knowing and systematic effort to evade the FLSA's minimum wage requirements.

176.    The Covered Employees are not exempt from the FLSA-mandated minimum wage because they are not executive, administrative or professional employees as the FLSA contemplates and as regulations and interpretative case law has defined those categories of exempt workers.

177.    The Covered Employees are not outside sales persons or otherwise exempt from the FLSA-mandated minimum wage protection under any of the provisions of the FLSA.

178.    Arise failed to pay its employees the federally required minimum wage for all hours worked during the period encompassed by this Complaint.

180.    Arise's intentional misclassification of the Covered Employees, or reckless disregard for their status as non-exempt employees under the FLSA, and Arise's corresponding willful and knowing failure to pay the federally required minimum wage to the Covered Employees for the three years prior to the filing of this Complaint, plus any periods of equitable tolling, entitles the Covered Employees to damages from Arise's.

## CLASS ACTION ALLEGATIONS

181.    Plaintiffs repeat and reallege each and every allegation contained in Paragraphs "1" through "158," "160" through "168" and "170" through "180" above, with the same force and effect as if set forth fully herein.

182.    Plaintiffs bring this opt-in class action under Section 216(b) on behalf of a nationwide class of all other persons and entities similarly situated.   The class who should receive FLSA-required notice ("Class") includes:

All persons or entities who, during the period beginning 3 years before the filing of this Complaint who worked as "independent contractors," IBOs, VSCs, CyberCorps, CSPs, "independent companies," "partners" or other affiliates of Arise, however styled, in servicing Arise's clients.

183.    Excluded from this Nationwide Class are:   Arise and all of its affiliated companies, directors, officers, and employees; and the Judge(s) assigned to this case.

184    The Class Plaintiffs reserve the right to modify or expand the Nationwide Class definition if discovery and/or further investigation show that the Class definition should be modified.

185.    Questions of law and fact exist common to all Class members, and predominate over any questions that affect only individual Class members.

186.    Principal and predominant common questions of law and fact include, for example:

A.    Whether Plaintiffs are Arise's employees under and for purposes of the federal labor laws, including, without limitation, the Fair Labor Standards Act?

B.    Whether the Plaintiffs are exempt or non-exempt employees under the FLSA or otherwise not protected under the FLSA minimum wage requirements?

C.    Whether Arise is an enterprise under the FLSA?

D.    Whether Arise is the Plaintiffs' employer for purposes of the FLSA?

E.    Did Arise fail to pay the Class Members the federally mandated statutory minimum wage during the Class Period?

F.    Are the Plaintiffs independent contractors and unprotected as employees under the FLSA?

G.    Does the corporate status of Plaintiffs preclude a finding that they are employees protected by the Fair Labor Standards Act?

H.     Does Arise's permission for the Plaintiffs to work for other employers preclude a finding that they are Arise's employees and protected by, among other things, the minimum wage provisions of the Fair Labor Standards Act?

I.     Should Arise be required to compensate the Plaintiffs based on the difference between the amount they were paid during the Class Period and the higher amount they would have received had they been paid the mandatory federal minimum wage?

J.     As a result of Arise's actions and failures to act, are the Class Members entitled to compensatory, restitutionary, statutory or other damages against Arise?

K.     Whether, and if so, to what extent, the purported mandatory arbitration clauses and class action waivers in Arise's most recent Statements of Work ("SOW") can preclude claims based on the FLSA.

L.     Whether, and if so, to what extent the purported mandatory arbitration clauses and class action waivers in Arise's most recent SOWs are unenforceable because they violate the Plaintiffs' due process rights.

M.     Whether, and if so, to what extent the purported mandatory arbitration clauses and class action waivers in Arise's most recent SOWs are unenforceable because the violate the Plaintiffs' Seventh Amendment rights to jury trials.

N.     Whether, and if so, to what extent the purported mandatory arbitration clauses and class action waivers in Arise's most recent SOWs are unenforceable because they impermissibly limit or prohibit the Plaintiffs' rights and ability to vindicate their federal statutory rights, including those under the F.L.S.A.

O.     Whether, and if so, to what extent the purported mandatory arbitration clauses and class action waivers in Arise's most recent SOWs are unenforceable because they

result from procedural unconscionability in the formation of the contracts, in light, among other things, of their adhesive quality, take-it-or-leave-it nature, and the relative sophistication and bargaining power of Arise and the workers Arise wants to call anything but its "employees."

        P.      Whether, and if so, to what extent the purported mandatory arbitration clauses and class action waivers in Arise's most recent SOWs are unenforceable on other grounds recognized and preserved by the Federal Arbitration Act, § 2, namely, "such grounds as exist at law or equity for the revocation of any contract," including duress, unilateral mistake, coercion, and other well established legal principles.

187.    Plaintiff Dowell's claims are typical of the claims of all of the Class Members because they are based on the same facts.

188.    Plaintiff Dowell's claims are typical of the claims of all of the Class Members because they are based on the same legal theories.

189.    Plaintiff Dowell's claims are typical of the claims of all of the Class Members because the Plaintiff's claims are based on the same remedial theories and requests for redress as those of all the Class Members.

190.    The Class is so numerous that joining all of the Class Members as plaintiffs in this action is impracticable.   Arise's own website shows the Class today would exceed 25,000 members.

191.    The Plaintiff is not adverse to the other Class Members.

192.    The Plaintiff has no interests that conflict with the interests of the other Class Members.

193.    The Plaintiff is similarly situated with, and has suffered similar injuries, losses and other damages as, the Class Members that the Plaintiff seeks to represent.

194.   The Plaintiff will fairly and adequately protect the interests of all the Class Members in further investigating, developing and litigating this action, and in all related administrative and other matters concerning this action.

195.   The Plaintiff has retained counsel experienced in complex and class action litigation, in matters involving consumer products, commercial and contractual claims, and common law and statutory claims.

196.   Neither the Plaintiff nor her retained counsel, have any interest that might lead them not to vigorously pursue this action.

197.   A class action is superior to other potentially available methods for resolving the Covered Employees' claims, because:

A.   The individual Class Members' damages are "negative value claims," that is, they are too small to justify the substantial expense and effort of individual lawsuits brought by counsel working for an hourly fee.   Arise's misconduct would go unaddressed and unremedied absent class action treatment, and no other means exists to compel Arise to internalize the cost of its wrongdoing.   Aggregating these fundamentally similar claims, however, makes this action financially feasible.

B.   Even if individual Class Members were wealthy enough to afford to bring such individual cases, the judicial system would be ill served and its scarce resources badly misspent by myriad small and fundamentally identical cases involving the same basic allegations, the same discovery and the same proofs, clogging dockets across the country.

C.   Individual litigation is not just impractical and inefficient, but also poses the risk of inconsistent or contradictory judgments.

D.      Concentration in one court of the action concerning Arise's failure to pay required overtime to its employees will: save judicial resources by, among other things, obviating the need for coordination of motion practice and discovery across numerous courts and jurisdictions; conserve the parties' resources by permitting the well-focused litigation of the many common issues through representative plaintiffs; produce enormous economies of scale by developing the many common issues through just a few representative plaintiffs; and result in consistent judicial findings, promoting respect for the judiciary and judicial system, through comprehensive supervision and administration of the case by a single court well versed in the issues.

E.      Justice will not be served, but will fail, in the absence of a class action of the Class Plaintiffs' claims.  Among other things, many if not all Plaintiffs lack the resources properly to litigate their claims.  Expert witnesses are necessary, the cost of which would alone be prohibitive for many if not all Plaintiffs.  Plaintiff Dowell, for example, could not afford to bring this case on her own and despite her desire to enforce her federal statutory rights, lacks the resources to hire competent and diligent hourly rate lawyers, the expert witnesses required and that the Defendants will surely retain, and bear the court and other costs that in even small stakes litigation can quickly mount into the tens of thousands of dollars.

F.      The difficulties inherent in and likely to arise in managing this Class Action are neither novel nor substantial.  Readily identifiable common issues predominate over individual issues, are readily identifiable, as described above, and will be efficiently developed through litigation of representative Class Members' cases.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiffs, on behalf of themselves and the other Covered Employees, pray that the Court issue its Judgment and Order against the Defendant as follows:

A.      Declare that the purportedly mandatory binding arbitration clause in the Defendant's agreements with the Covered Employees is null and void and creates no prohibition to the Plaintiffs and Covered Employees prosecuting their claims to resolution in this Court;

B.      Declare that the purported class/collective action waiver in the Defendant's agreements with the Covered Employees is null and void and creates no prohibition to the Plaintiffs and Covered Employees prosecuting their claims as an FLSA opt-in class/collective action in this Court;

C.      Declare that Arise's business practices described in this Complaint, including, without limitation, Arise's failure to pay the Plaintiffs and Covered Employees the federally mandated minimum wage, violates the FLSA;

D.      Declare that Arise is financially and administratively responsible to notify all Covered Employees of Arise's wage and hour violations as alleged in this Complaint;

E.      Designate and appoint Plaintiff as representative of the Class Members and Covered Employees for purposes of the FLSA claim for unpaid federally required minimum wages;

F.      Designate and appoint the firms of Kopelowitz Ostrow P.A., Keefe Bartels LLC and Eichen, Crutchlow, Zaslow & McElroy (collectively "the Firms") as attorneys for the Class Members and Covered Employees;

G.      Award damages, including liquidated damages, to the Plaintiffs and Covered Employees;

H.      Award pre-judgment and post-judgment interest as provided by law;

I.      Award penalties available under applicable law to the Plaintiffs and Covered Employees;

J.      Award reasonable attorneys' fees as appropriate including, without limitation, under 29 U.S.C.§ 216(b).

K.      Award the costs of this action, including, without limitation, expert witness fees and costs;

L.      Award such other and further legal and equitable relief as the Court deems just, necessary and proper in all the circumstances.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a jury trial on all of their claims, and on all defenses, counterclaims and cross-claims that might be interposed, as to which a jury trial is available as of right or otherwise.

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Dated:  October 2, 2012

KOPELOWITZ OSTROW P.A.

/s/ Jan Douglas Atlas
Jan Douglas Atlas
Florida Bar No. 22626
atlas@kolawyers.com
Robin Corwin Campbell
Florida Bar No. 327931
campbell@kolawyers.com
200 S.W. 1st Avenue, Suite 1200
Fort Lauderdale, Florida 33301
Telephone: (954) 525-4100


KEEFE BARTELS, LLC

/s/ Stephen G. Grygiel
Stephen G. Grygiel
sgrygiel@keefebartels.com
John E. Keefe, Jr.
New Jersey Bar No. 034081990
jkeefe@keefebartels.com
For the Firm
170 Monmouth St.
Red Bank, NJ 07701
Telephone:    732-224-9400



EICHEN CRUTCHLOW ZASLOW
& McELROY

/s/ Barry R. Eichen
Barry R. Eichen
New Jersey Bar No. 015851986
beichen@njadvocates.com
Thomas Paciorkowski
New Jersey Bar No. 000822008
TPaciorkowski@njadvocates.com
For the Firm
40 Ethel Road
Edison, NJ 08817
Telephone:    (732) 777-0100

## VERIFICATION

By: _____
Tina Dowell

STATE OF FLORIDA      )
                      ) SS
COUNTY OF BROWARD     )

    The foregoing instrument was acknowledged before me this ⁀ day of ~~July~~, *August 8th* 2012 by Tina Dowell, who is personally known to me or (____) has produced _FL DL_ as identification.

_____
NOTARY PUBLIC, State of Fla.
Print Name: SHELLEY RAMNAUTH
Commission No.: EE 147306



SHELLEY RAMNAUTH
Notary Public - State of Florida
My Comm. Expires Dec 27, 2015
Commission # EE 147306
Bonded Through National Notary Assn.

## STATEMENT OF WORK TO THE ARISE - VIRTUAL SERVICES CORPORATION MASTER SERVICES AGREEMENT
### AAA MSC NCNU_AZ APPLICATION

This Statement of Work to the Arise - Virtual Services Corporation Master Services Agreement (the "SOW") is entered as of **May 1, 2011** (the "Effective Date"), between F W Dowell INC ("Virtual Services Corporation") and Arise Virtual Solutions Inc ("Company").

Capitalized terms used in this SOW shall have the meaning as defined in that certain Arise - Virtual Services Corporation Master Services Agreement entered between Virtual Services Corporation and Company, including all exhibits and schedules thereto, unless otherwise defined in this SOW.

Virtual Services Corporation and Company agree that this SOW shall be incorporated by reference, and become a part of the Arise - Virtual Services Corporation Master Services Agreement (the "Agreement") effective the Effective Date.

The term "Virtual Services Corporation" for purposes of this SOW shall have the same meaning as the term "CyberCorp" as that term is defined in the Agreement. The term "Arise Certified Professional" for purposes of this SOW shall have the same meaning as the term "CyberAgent" as that term is defined in the Agreement.

"Client" in this SOW shall mean AAA MSC.

## 1.    Description of Application

Company desires to engage Virtual Services Corporation ("VSC"), and VSC desires to be engaged by the Company, to handle the following type of call:  inbound customer service calls**.**

## 2.    Selection of Service Shifts

The Company shall post service shift opportunities electronically in half hour intervals on its proprietary scheduling system ("StarMatic®"). Such service shifts shall only be accepted by VSC in the name of the Arise Certified Professional ("ACP") that has been assigned by VSC to actually service any such service shifts ("Assigned VSC ACP"). Once VSC selects service shifts to service ("Accepted Shifts"), VSC agrees and acknowledges that it is obligated to service such Accepted Shifts. The Company, at its sole discretion, may agree to release VSC from its commitment to service any Accepted Shift for good cause shown by VSC. No such release shall be effective unless provided by Company to VSC in writing prior to the commencement of such Accepted Shift.

VSC shall provide, per Assigned VSC ACP, at least **Fifteen (15) hours** of Accepted Shifts service per week during the term of this SOW; unless, however, the Company is unable to provide VSC with the opportunity to be scheduled for at least **Fifteen (15) hours** of Accepted Shifts services during any such week - - in which case VSC shall schedule service for such lesser number of hours that are made available by the Company. **Five (5) hours** of the **Fifteen (15) hours** of Accepted Shifts should be selected from the following shift opportunities: **any posted service shifts on Sunday and/or Saturday** ("Initial Eligible Shifts"). The Initial Eligible Shifts must be selected prior to VSC selecting Accepted Shift service outside of the Initial Eligible Shift hours – in which case VSC shall be permitted to provide Accepted Shifts service for any posted service shift opportunities ("All Other Eligible Shifts"). For the Select Dates stated in Table 1 below, the **Minimum Hour Requirement** must be serviced on those days**\***.

| Minimum Hour Requirement | Select Dates |
|---|---|
| Seven and one- half (7.5) hours* | May 29th, 30th and/or 31st |
| Seven and one- half (7.5) hours* | July 3rd, 4th and/or 5th |

Table 1

\* The Assigned ACP may service the 7.5 hours of Accepted Shifts from Table 1 above on any individual Select Date or any combination of Select Dates at the Assigned ACP's discretion. Accepted Shifts serviced on the Select Date shall be applied to the 15 hours of Accepted Shifts for the applicable week.

Example : Assigned ACP services

## COMPOSITE EXHIBIT "A"

- 3 hours on July 3rd
- 1.5 hours on July 4th
- 3 hours on July 5th

> 3 hours on July 3rd , 1.5 hours on July 4th and 3 hours on July 5th shall be applied toward the 15 hours of Accepted Shifts the week beginning on Sunday, July 3rd and ending Saturday, July 9th

> The 3 hours on July 3rd also satisfies the weekend commitment of July 3rd through July 9th.

> For a total of 7.5 hours serviced on the Select Dates.

Notwithstanding the above minimum Accepted Shift commitment, if the assigned VSC ACP is also servicing AAA MSC – OK SD MTW application under separate SOW, each Assigned VSC ACP shall only be required to provide at least **Ten (10) hours** of Accepted Shifts service per week on the AAA MSC NCNU AZ Application. For the Select Dates stated in Table 2 below, the **Minimum Hour Requirement** must be serviced on those days*.

| Minimum Hour Requirement | Select Dated |
|---|---|
| Seven and one- half (7.5) hours* | May 29th, 30th and/or 31st |
| Seven and one- half (7.5) hours* | July 3rd, 4th and/or 5th |

Table 2

* The Assigned ACP may service the 7.5 hours of Accepted Shifts from Table 2 above on any individual Select Date or any combination of Select Dates at the Assigned ACP's discretion. Accepted Shifts serviced on the Select Date shall be applied to the 10 hours of Accepted Shifts for the applicable week.

The Company reserves the right to remove, at its discretion; Accepted Shifts that become unnecessary due to a decrease in Client's call volume.

### 3.    Arise Certified Professional Assigned VSC ACP(s) Assigned by Virtual Services Corporation

The following Assigned VSC ACPs have been assigned by VSC to service Client's Application under this SOW:  Tina Dowell.  VSC shall not assign any other Arise Certified Professional Assigned VSC ACP of Virtual Services Corporation without first notifying the Company in writing of the name of such Arise Certified Professional Assigned VSC ACP and obtaining from the Company all required Login Codes for such Arise Certified Professional Assigned VSC ACP.

If a Client Application Opportunity required that the Assigned VSC ACP be subject to and comply with a non-compete obligation during the term of a SOW and/or for a specific period of time after the expiration or termination of the SOW, then a violation of the non-compete obligation as stated in the Opportunity and/or the SOW shall be deemed a material breach of both the MSA and the SOW and grounds for immediate termination of any and all agreements entered into by and between the VSC and Company.

During the Term of this SOW the VSC represents and warrants that the Assigned VSC ACP does not currently work directly for or provide any contracted services to AAA MSC outsource vendors who provide Emergency Roadside Assistance.

### 4.    Service Level Requirements

VSC shall cause each Assigned VSC ACP of the VSC to adhere to the following Service Level Requirements:

| Service Level Requirements | |
|---|---|
| Commitment Adherence (Schedule Release Ratio) | > = 90% |
| AUX | < = 5% |
| Ring No Answer*** | < = 4% |

| Priority Commitment | 100% |
|---|---|
| QA (% if scans meets or exceeds) | > = 85% |
| Q – 12 Member Satisfaction | > = 85% |
| Average Talk Time (ATT) | > = 225 and < = 265 seconds |
| Average Talk Time (AHT) | > = 245 and < = 285 seconds |
| Release Hours Restriction | During the service week (Sunday through Saturday) the Assigned ACP cannot release more than 25% of the total hours posted for that week. |

Failure to meet one or more of the Service Level Requirements by any Assigned VSC ACP shall be deemed to be a failure to perform and may subject this SOW to immediate termination by the Company and/or the revocation or suspension of such Assigned VSC ACP's certifications by the Company. The Service Level Requirements may be modified by the Company from time to time upon notice to VSC.

With respect to the Service Level Requirement pertaining to Commitment Adherence, the following formula will be used to calculate such metric:

(Serviced minutes + Excused Non Serviced Minutes)/(posted minutes + released minutes)

For purposes of the above formula: "posted Minutes" shall equal the total number of minutes of Accepted Shift; "posted serviced" shall mean the total number of minutes of Accepted Shift actually serviced; and, "released" shall mean the total number of minutes of Accepted Shift that was not serviced or otherwise permitted by Company to release prior to the commencement of that particular Accepted Shift.

In the event that the Commitment Adherence percentage for any Assigned VSC ACP is below 90% for 3 consecutive weeks or is below 90% during any rolling 60 day period, in addition to any other remedies provided to the Company under this SOW or in the Agreement, the Company, at its sole discretion, shall have the right to disable the login codes ("Login Code Disabling Event") for this or any other Statement of Work that is outstanding between the Company and VSC for a period of one (1) week to allow the VSC to implement whatever policies and/or controls that it deems necessary and appropriate to enable the VSC to meet its Commitment Adherence obligations.

In the event that within any rolling four (4) month period following a Login Code Disabling Event, VSC again sustains a Login Code Disabling Event, the Company shall terminate this SOW and shall also have the right to terminate any other outstanding Statements of Work and/or the Agreement.

Each Assigned VSC ACP of VSC who has had their certification revoked twice within a 4 month rolling window due to their materially deficient Commitment Adherence percentage may be subject to having his or her Arise Certified Professional certification permanently revoked by the Company and VSC is subject to having this SOW and/or the Agreement terminated by Company.

VSC shall, and cause its Assigned VSC ACPs to, fully cooperate with the Company and its Assigned VSC ACPs in connection with VSC's rendition of services under this SOW.

## 5. Term of SOW

This SOW shall commence on the **Effective Date** and shall expire **August 31, 2011**. VSC shall commence providing Accepted Shift service no later than two days from the Effective Date.

This SOW shall be subject to termination by any party prior to its expiration for breach of the terms of this SOW by the other party.

This SOW may be terminated immediately without cause upon request of the Client.

Notwithstanding anything to the contrary, this SOW shall automatically terminate upon the expiration or termination of the service agreement between the Company and the Client, or the expiration or termination of the statement of work entered between the Company and Client with respect to this Application. The Company shall provide VSC with as much advance notice as is reasonably practicable with respect to any such expiration or termination.

Termination from any other Client Application due to a material breach shall be deemed a material breach of this SOW and this SOW may be terminated at Company's sole discretion.

6.    **VSC Service Fee**

    a.   VSC shall be entitled to invoice and be paid a "Service Fee" on a semi-monthly basis (1st to the 15th and the 16th to the end of the month) (hereinafter the "Invoice Period(s)") for servicing its Accepted Shifts during the Invoice Period.

    b.   The Service Fee that will be due to the VSC during an Invoice Period <u>shall be the greater of either the Base Service Fee or the Alternate Base Service Fee as defined below.</u>

    c.   The amount of the "**Base Service Fee**" owed to the VSC for the Invoice Period shall be calculated using the base per call rate multiplied by the total number of calls serviced by the Assigned VSC ACP during the Invoice Period ("**Base Rate**"). The Base Per Call Rate is calculated based on Table 3 below.

| Metric | Base Per Call Rate |
|---|---|
| Commitment Adherence is = or > 90% and Quality is = or > 85% | $1.17 |
| Commitment Adherence is < 90% and/or Quality is < 85% | $1.05 |

Table 3

    d.   Between the hours of Midnight and 9 am, the Company may use the base service rate of $**10.00** per hour (the "**Alternate Base Rate**") multiplied by the total number of hours serviced by the Assigned VSC ACP during the Invoice Period, to determine the total amount of the Service Fee due to the VSC for the Invoice Period. Hereinafter this service fee shall be referred to as the "**Alternate Base Service Fee**".

    e.   Definitions:

        a.   Call Quality (QA): Shall mean the average of all call quality scores received from the 1st through the 15th and from the 1st through the end of the month as applicable.

        b.   Commitment Adherence (CA%): Shall mean the Schedule Adherence minus Release Ratio, which shall be calculated as specified above in Section 4.

Note: To determine the Base Per Call Rate for the Invoice Period ending on the 15th, the Company will review the Commitment Adherence and Quality scores from the 1st through the 15th. To determine the Base Per Call Rate for the Invoice Period ending at the end of the month, the Company will review the Commitment Adherence and Quality scores from the 1st through the end of the month.

Notwithstanding the aforementioned, nothing stated here shall be interpreted or construed as a waiver of any right that Company may have to enforce the VSC's obligations to provide services under the Client Application in accordance with the terms of the Service Level Requirements set forth in Section 4.

Notwithstanding anything to the contrary herein, the following calls shall not be eligible for payment: (a) Any calls handled that were not within an Accepted Shift unless VSC received prior written permission from the Company to service a shift that is not an Accepted Shift; and (b) Any calls of a duration of thirty (30) seconds or less; or, any "System Abuse Calls," as hereinafter defined. "System Abuse Calls" shall mean any of the following: pre-maturely terminating calls; and, calls that are unnecessarily transferred to Client.

Notwithstanding anything to the contrary herein, with respect to the Base Rate or Alternate Base Rate, the following time **shall not** be included in determining the amount of hours of service provided by VSC during each semi-monthly Invoicing Period: time when any Assigned VSC ACP is on any Aux status for more than 5% of "total staffed time" as captured by the Company's systems. Aux statuses includes: On Break, No Answer, Authorized, Coaching, and ACW.

The Company shall compute the payments that VSC is entitled for each payment period based on the call information captured by the Company's data systems. The Company shall provide such information per each payment period to VSC broken down by the aggregate number of calls that each Assigned VSC ACP of VSC serviced during each such payment period. One call may encompass all functions necessary to complete service to the AAA member. Functions such as outbound calls to the member and MSC support may be included in one call.

7.    **Representations and Warranties**

As a material inducement for Arise to enter into this Agreement, VSC hereby represents and warrants to Arise that all of the following are true and accurate:

1. That VSC has been duly incorporated under the Laws of the State of **Florida** ("State of Incorporation");
2. That VSC has made all of its required filings under its State of Incorporation and has not received notice from such state that the VSC has been dissolved or is delinquent in any required filings;
3. *That if the VSC's State of Incorporation is a state other than Florida, that* VSC is qualified to transact business in the State of Florida as a foreign corporation;
4. That the following individual or individuals each own at least 49% of the outstanding capital stock of Virtual Services Corporation:  **Tina D Dowell** ;
   (each such individual defined as a "Principal Owner");
5. That the undersigned Principal Owner or Principal Owners shall be actively involved in the direction of the business of the VSC and the performance of CSR services under this SOW;
6. That as of the Effective Date of this SOW, the following individual or individuals have been employed or contracted by the VSC for purposes of providing CSR services on behalf of the VSC under this SOW:  **Tina D Dowell** (each an "ACP");
7. That any ACP assigned to provide services under this SOW to Client is authorized to work in the United States and is not subject to any Federal Watch list;
8. That VSC will be solely responsible to compensate and provide any benefits that may be required by law (including but not limited to workers' compensation and unemployment insurance) to any person employed by or deemed an Assigned VSC ACP of VSC under the any federal or state law or regulation;
9. That any person or ACP employed by or assigned by VSC to service the client shall not be eligible to participate in any Assigned VSC ACP benefit program maintained by Arise or any client of Arise;
10. That VSC's Assigned VSC ACPs or assigned ACPs shall not be eligible to receive any unemployment benefits, workers compensation benefits, or any other type of benefits or insurance from Arise or any client of Arise;
11. That VSC represents and agrees that its Assigned VSC ACPs hereby irrevocably waive any right: to assert a claim directly or indirectly against Arise or any client of Arise with respect to any of the benefits enumerated in paragraphs 8 through 11 above; or, to assert a claim with any governmental entity or any other third party seeking to hold Arise or any client of Arise liable for providing any of the benefits enumerated in paragraphs 8 through 10, above;

12. That as of the Effective Date of this SOW, each ACP (also referred to in the Agreement as a "Assigned VSC ACP") employed or assigned by VSC to provide the services described hereunder has signed:  a waiver in the form attached hereto as Exhibit "A" to the SOW, an employment agreement, if applicable, in the form set forth in Exhibit B to the Agreement, and a non disclosure Agreement attached hereto as Exhibit B to this SOW;
13. That VSC agrees on behalf of itself and all ACPs employed by VSC, to comply with the terms of Section 6 of the Agreement "Protection of Confidential Information; Data Security", which is incorporate herein and made a part hereof by this reference as if fully set forth and that any violation of Section 6 by VSC or any of its Assigned VSC ACPs shall be deemed a material breach of this SOW and the Agreement;
14. That VSC agrees to ensure and require that all ACPs, who are assigned to service the Client Application under this SOW, will execute Exhibit A and Exhibit B attached hereto, and VSC further agrees to provide copies of the executed documents to Arise within fifteen (15) days from the date of being Contracted.  "Contracted" shall mean that the VSC ACP Assigned VSC ACP has successfully completed the Client Certification Course, executed the applicable SOW, submitted corporate banking information, and has been granted system access to provide Services to the applicable Client;
15. That VSC warrants that the requirements set forth above, were previously satisfied and that VSC has complied with same by providing the executed documents set forth in Exhibit A, and Exhibit B of this SOW to Company, all in accordance with the terms of the Agreement and this SOW;
16. That VSC further agrees that Arise and Client are third party beneficiaries of the non-disclosure agreement attached hereto as Exhibit B, and that ACP's breach of the terms of Exhibit B, shall also be deemed a breach of this SOW and the Agreement entitling Arise to terminate this SOW and the Agreement and to take direct action against the ACP to enforce the terms of the non-disclosure agreement;
17. That as of the Effective Date of this Agreement, the VSC has obtained workers compensation coverage for any CSR/ACP Assigned VSC ACP required to have such coverage under Florida law;
18. That VSC shall at all times be in compliance with and shall not violate any applicable federal, state and local laws, rules, regulations and ordinances, including, but not limited to (if applicable), the Federal Telephone Consumer Protection Act of 1991, the Federal Consumer Fraud and Abuse Prevention Act of 1994, the Telemarketing and Consumer Fraud and Abuse Prevention Act, as amended; and;

19. That all Assigned VSC ACPs shall access Client's Customer Data only to provide the Services, and shall not disclose it to any third persons.

By entering into this SOW, Arise has relied on the accuracy of the above affirmative representations and warranties. Failure to comply with any of the affirmative representations and warranties set forth here or in the Agreement, will be deemed a material breach of the terms of this SOW, entitling Arise to terminate this SOW and/or the MSA without further notice or liability.

## 8. Terms of Certification

VSC warrants that the Assigned VSC ACP providing services under this SOW has taken and passed ACP 101 and the applicable Client Certification Course. In addition, the VSC acknowledges and agrees to the following conditions which shall apply to all certifications granted to any VSC Assigned VSC ACP hereunder: (i) Company is the sole certifying authority and therefore, the granting of any certification to a VSC Assigned VSC ACP, lies solely within Company's determination that the VSC Assigned VSC ACP has complied with all of the certification requirements set by Company, (ii) all certifications have a period of duration of 12 months (the "Certification Period") and must be renewed by the VSC Assigned VSC ACP upon expiration of the applicable Certification Period (iii) the certification requirements applicable to any existing certification granted hereunder may be modified by Company, at its sole discretion, at any time during the Certification Period, without prior notice to the VSC, and (iv) as a general condition for renewal and maintaining any certification granted hereunder, all VSCs shall ensure that their VSC Assigned VSC ACPs shall comply with all continuing certification education requirements set by Company, to include the successful completion of any courses provided and made available by Company to the VSCs, for the purpose of enhancing and updating skills related to any certification held by any VSC Assigned VSC ACP.

There is an expectation that all Assigned VSC ACPs will perform their own work on all assignments and take exams with honor, integrity and professionalism. Company has a "zero tolerance" for cheating. Cheating includes but is not limited to (1) someone other than the Assigned VSC ACP attending the Certification Class on behalf of the Assigned VSC ACP, (2) publishing in any manner, whether written or oral, assignments, projects, exam questions or results, and (3) submission of assignments or exams that is not the work of the Assigned VSC ACP. The decision as to whether an Assigned VSC ACP has cheated is at the sole discretion of Company. Upon a determination of cheating, this SOW shall be terminated immediately, the Assigned VSC ACP expelled from the Certification Class. Any Assigned ACP Assigned VSC ACP caught cheating will be permanently removed from the Company network.

## 9. Amendment of Terms

The Company reserves the right to amend the terms of this SOW upon reasonable written notice to the VSC, unless such notice becomes impractical due to exigent (i.e. emergencies) circumstances. The "Amendment" shall be deemed accepted by the VSC unless VSC sends written notice of termination of the SOW, within 10 days of VSC's receipt of the notice of amendment from the Company indicating that the Amendment is not acceptable to VSC and that VSC intends to terminate the SOW. Notwithstanding the aforementioned, Company reserves the right, at any time and without prior notice to VSC, to amend the terms of this SOW or change any of the procedures or policies set forth herein, which the Company determines in it's sole discretion may be required to comply with its internal security policies, or with any federal or state law, rule or regulation.

## 10. Notice

Any notice that is required to be provided by the parties herein may be provided by e-mail, in addition to the notice procedures set forth in the Arise-Virtual Services Corporation Master Services Agreement.

**In witness whereof**, the parties have duly executed and delivered this Agreement.

F W Dowell INC

By: *Tina D Dowell*

Title: Vice President

Arise Virtual Solutions Inc.

By: *Jared Fletcher*

Title:     Director

**EXHIBIT A**
**WAIVER OF ASSIGNED VSC ACP IN FAVOR OF THE VIRTUAL SERVICES CORPORATION**

<u>Instructions</u>: The Virtual Services Corporation must return Waiver executed by each of its Assigned ACP(s) to Arise within fifteen (15) days of receipt.

As a material inducement for, and in consideration of, F W Dowell INC (the "Virtual Services Corporation") agreeing to employ or assign Tina D Dowell (the "Assigned VSC ACP"), agrees to ensure that each Assigned VSC ACP acknowledges and agrees and follows:

1.  It is solely the responsibility of Virtual Services Corporation to compensate and provide any benefits that may be required by law (including but not limited to workers' compensation and unemployment insurance) to Assigned VSC ACP.
2.  Assigned VSC ACP shall not be eligible to participate in any Assigned VSC ACP benefit program maintained by Arise or any client of Arise.
3.  Assigned VSC ACP shall not be eligible to receive any unemployment benefits, workers compensation benefits, or any other type of benefits or insurance from Arise or any client of Arise
4.  Assigned VSC ACP hereby irrevocably waives any right: to assert a claim directly or indirectly against Arise or any client of Arise with respect to any of the benefits enumerated in paragraphs 1 through 3, above; or, to assert a claim with any governmental entity or any other third party seeking to hold Arise or any client of Arise liable for providing any of the benefits enumerated in paragraphs 1 through 3, above.
5.  Arise and any client of Arise shall be deemed to be a third party beneficiary of this Waiver Agreement and each of them shall jointly and/or severally have the right to enforce this Waiver Agreement against Assigned VSC ACP.
6.  Any action that is contrary to the representations of the waiver provided herein shall be deemed a material breach of the applicable Statement of Work and may result in Arise terminating the Virtual Service's Corporation's Statement of Work and the Virtual Services Corporation's Master Services Agreement.
7.  In the event that the undersigned files an unemployment claim, a copy of the waivers made herein shall be provided to the agency for which a claim is filed by the undersigned.
8.  All obligations and rights herein shall survive beyond the termination, cancellation or expiration of the Master Services Agreement or a Statement of Work, irrespective of the cause and shall apply to any and all Client Applications serviced by the Assigned ACP.

Signed this _____ day of _____, 20__.

ASSIGNED VSC ACP SIGNATURE: _____          ACP ID:_____

**EXHIBIT B**

**NON-DISCLOSURE AGREEMENT**

<u>Instructions</u>: The Virtual Services Corporation must return a Non-Disclosure Agreement that has been executed by each of its Assigned ACPs to Arise within fifteen (15) days of receipt.

Agreement (the "Agreement") between F W Dowell INC (the "Virtual Services Corporation") and Tina D Dowell (the "Assigned VSC ACP"), effective _____, 20____.

WHEREAS, for the purpose as stated in Section 2 below, the Virtual Services Corporation and the Assigned VSC ACP (collectively referred to as the **"Parties"** and individually referred to as a **"Party"**) have determined to establish terms governing the use and protection of Confidential Information (as defined in Section 1 below) that the Virtual Services Corporation may disclose to the Assigned VSC ACP.

WHEREAS, Assigned VSC ACP has been assigned by Virtual Services Corporation to service the Client Application under the terms the Statement of Work ("SOW") for the Client Application, executed by and between Arise Virtual Solutions Inc. and Virtual Services Corporation, dated _____ ___, 20___.

NOW, THEREFORE, the Parties agree as follows:

1. **"Confidential Information"** means all information, materials, documentation and data furnished and disclosed by the Virtual Services Corporation, Arise or Client to the Assigned VSC ACP, whether in oral, written, graphic or machine-readable form, including but not limited to, products and services, intellectual property, distribution channels, strategic alliances, marketing plans, software codes, designs, procedures, processing flowcharts, configurations, formulas, discoveries, inventions, improvements, concepts, ideas, customer lists, business plans, contacts and other business and technical information, except for such information and data as the parties agree in writing is not proprietary or confidential. Confidential Information shall also include information and materials in the Virtual Services Corporation's possession, custody or control for any other person or entity that the Virtual Services Corporation is obligated to treat as confidential or proprietary. The term **"Affiliate"** means any person or entity directly or indirectly controlling, controlled by, or under common control with a Party.

2. The Assigned VSC ACP may use Confidential Information only for the benefit of the Virtual Services Corporation and only while Assigned VSC ACP is employed to perform services for the Virtual Services Corporation.

3. The Assigned VSC ACP agrees to hold in confidence and not disclose, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose, the Confidential Information or any portion thereof, without the prior written permission of the Virtual Services Corporation.

4. The restrictions of this Agreement on use and disclosure of Confidential Information shall not apply to information that:

    (a)    Was publicly available at the time of the Virtual Services Corporation's communication thereof to the Assigned VSC ACP;

    (b)    Becomes publicly available through no fault of the Assigned VSC ACP subsequent to the time of the Virtual Services Corporation's communication thereof to the Assigned VSC ACP;

    (c)    Was in Assigned VSC ACP's possession free of any obligation of confidence at the time of the Virtual Services Corporation's communication thereof to the Assigned VSC ACP; provided, however, that the Assigned VSC ACP immediately informs the Virtual Services Corporation in writing to establish the Assigned VSC ACP's prior possession;

    (d)    Is developed by the Assigned VSC ACP independently of and without reference to any of the Virtual Services Corporation's Confidential Information or other information that the Virtual Services Corporation disclosed in confidence to any third party;

    (e)    Is rightfully obtained by the Assigned VSC ACP from third parties authorized to make such disclosure without restriction; or

    (f)    Is identified by the Virtual Services Corporation as no longer proprietary or confidential.

5. In the event the Assigned VSC ACP is required by law, regulation or court order to disclose any of the Virtual Services Corporation's Confidential Information, the Assigned VSC ACP will promptly notify the Virtual Services Corporation in writing prior to making any such disclosure in order to facilitate the Virtual Services Corporation seeking a protective order or other appropriate remedy from the proper authority. Assigned VSC ACP agrees to cooperate with the Virtual Services Corporation in seeking such order or other remedy. Assigned VSC ACP further agrees that if the Virtual Services Corporation is not successful in precluding the requesting legal body from requiring the disclosure of the Confidential Information, it will furnish only that portion of the Confidential Information, which is legally required and will exercise all reasonable efforts to obtain reliable assurances that confidential treatment

will be accorded the Confidential Information.

6.     All Confidential Information disclosed under this Agreement (including information in computer software held in electronic storage media) shall be and remain the property of the Virtual Services Corporation. All such information in tangible form shall be destroyed or returned to the Virtual Services Corporation promptly upon written request or the termination or expiration of this Agreement, and shall not thereafter be retained in any form by the Assigned VSC ACP. All Confidential Information in any computer memory or data storage apparatus shall be erased or destroyed.

7.     This Agreement shall become effective as of the date first written above and shall automatically expire upon the termination of Assigned VSC ACP's employment with the Virtual Services Corporation. Notwithstanding the termination of this Agreement for any reason whatsoever, all of the Assigned VSC ACP's non-disclosure obligations pursuant to this Agreement (and the Virtual Services Corporation's rights and remedies with respect thereto) shall survive with respect to any Confidential Information received prior to such expiration or termination.

8.     The Assigned VSC ACP acknowledges that Confidential Information is unique and valuable, and that disclosure in breach of this Agreement will result in irreparable injury to the Virtual Services Corporation for which monetary damages alone would not be an adequate remedy. Therefore, the Assigned VSC ACP agrees that in the event of a breach or threatened breach of confidentiality the Virtual Services Corporation shall be entitled to specific performance and injunctive relief as a remedy for any such breach or anticipated breach without the necessity of posting a bond. Any such relief shall be in addition to and not in lieu of any appropriate relief in the way of monetary damages.

9.     Virtual Services Corporation and Assigned VSC ACP agree that Arise and Arise's Client, as described in the SOW, are third party beneficiaries of this non-disclosure agreement and that Arise or Client shall have the right to the remedies and to take any of the actions described in Section 8 herein above, against Assigned VSC ACP to enforce the terms of the non-disclosure agreement due to Assigned VSC ACP's breach or improper disclosure of any Arise or Client Confidential Information or data in violation of the terms hereof.

10.     No failure or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

11.     This Agreement: (a) is the complete agreement of the Parties concerning the subject matter hereof and supersedes any prior agreements with respect to further disclosures concerning such subject matter; (b) may not be amended or in any manner modified except by a written instrument signed by authorized representatives of both Parties; and (c) shall be governed and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws.

12.     If any action is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorney's fees, costs and all expenses even if not taxable as court costs (including, without limitation, all such fees, costs and expenses incident to appellate, and bankruptcy proceedings), incurred in that action, in addition to any other relief to which such party or parties may be entitled. Attorney's fees shall include, without limitation, paralegal fees, investigative fees, administrative costs, sales and use taxes and all other charges billed by the attorney to the prevailing party.

13.     If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provision shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the Parties as expressed herein.

14.     Any third party who supplied Confidential Information to the Virtual Services Corporation shall be deemed to be a third party beneficiary of this Agreement in the event of any breach of this Agreement by the Assigned VSC ACP with respect to such Confidential Information.

     **IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

**VIRTUAL SERVICES CORPORATION**          **ASSIGNED VSC ACP**

By: _____          By: _____

**STATEMENT OF WORK TO THE ARISE - VIRTUAL SERVICES CORPORATION MASTER SERVICES AGREEMENT
AAA MSC NCNU_AZ APPLICATION**

This Statement of Work to the Arise - Virtual Services Corporation Master Services Agreement (the "SOW") is entered as of **September 1, 2011** (the "Effective Date"), between F W Dowell INC ("Virtual Services Corporation") and Arise Virtual Solutions Inc ("Company").

Capitalized terms used in this SOW shall have the meaning as defined in that certain Arise - Virtual Services Corporation Master Services Agreement entered between Virtual Services Corporation and Company, including all exhibits and schedules thereto, unless otherwise defined in this SOW.

Virtual Services Corporation and Company agree that this SOW shall be incorporated by reference, and become a part of the Arise - Virtual Services Corporation Master Services Agreement (the "Agreement") effective the Effective Date.

The term "Virtual Services Corporation" or "VSC" for purposes of this SOW shall have the same meaning as the term "CyberCorp" as that term is defined in the Agreement.

The term "Arise Certified Professional" for purposes of this SOW shall have the same meaning as the term "CyberAgent" as that term is defined in the Agreement.

The term "Assigned VSC ACP" or "Assigned ACP" shall mean the Arise Certified Professional ("ACP") that has been assigned by a Virtual Service Corporation ("VSC") to actually service any Accepted Service shift.

The term "Client" in this SOW shall mean AAA MSC.

The term "Client Application" shall mean the AAA MSC NCNU_AZ application.

1. **Description of Application**

Company desires to engage VSC, and VSC desires to be engaged by Company, to handle the following type of call: inbound customer service calls.

2. **Selection of Service Shifts**

The Company shall post service shift opportunities electronically in half hour intervals on its proprietary scheduling system ("StarMatic®"). Such service shifts shall only be accepted by VSC in the name of the ACP that has been assigned by VSC to actually service any such service shifts. Once VSC selects service shifts to service ("Accepted Shifts"), VSC agrees and acknowledges that it is obligated to service such Accepted Shifts. Company, at its sole discretion, may agree to release VSC from its commitment to service any Accepted Shift for good cause shown by VSC. No such release shall be effective unless provided by Company to VSC in writing prior to the commencement of such Accepted Shift.

VSC shall provide, per Assigned VSC ACP, at least **Fifteen (15) hours** of Accepted Shifts service per week during the term of this SOW; unless, however, Company is unable to provide VSC with the opportunity to be scheduled for at least **Fifteen (15) hours** of Accepted Shifts serviced during any such week - - in which case VSC shall schedule service for such lesser number of hours that are made available by Company. **Five (5) hours** of the **Fifteen (15) hours** of Accepted Shifts should be selected from the following shift opportunities: **any posted service shifts on Sunday and/or Saturday**. For the Select Dates stated in Table 1 below, the **Minimum Hour Requirement** must be serviced on those days.

| Minimum Hour Requirement | Select Dates |
|---|---|
| Ten (10) hours | September 2nd, 3rd, 4th and/or 5th |
| Seven and one- half (7.5) hours | November 23rd, 24th and/or 25th |
| Seven and one- half (7.5) hours | December 24th, 25th and or 26th |

| Seven and one- half (7.5) hours | December 31st, January 1st and January 2nd |
|---|---|

Table 1

Notwithstanding the above minimum Accepted Shift commitment, if the assigned VSC ACP is also servicing AAA MSC – OK SD MTW application under separate SOW, each Assigned VSC ACP shall only be required to provide at least **Ten (10) hours** o Accepted Shifts service per week on the AAA MSC NCNU AZ Application.  For the Select Dates stated in Table 2 below, the **Minimum Hour Requirement** must be serviced on those days.

| Minimum Hour Requirement | Select Dated |
|---|---|
| Ten (10) hours | September 2nd, 3rd, 4th and/or 5th |
| Seven and one- half (7.5) hours | November 23rd, 24th and/or 25th |
| Seven and one- half (7.5) hours | December 24th, 25th and or 26th |
| Seven and one- half (7.5) hours | December 31st, January 1st and January 2nd |

Table 2

Company reserves the right to remove, at its discretion; Accepted Shifts that become unnecessary due to a decrease i Client's call volume.

### 3. Assigned VSC ACP(s)

The following Assigned VSC ACPs have been assigned by VSC to provide Services on the Client's Application under thi SOW:  Tina D Dowell.  VSC shall not assign any other Assigned ACP of the VSC without first notifying Company in writing of the name of such Assigned ACP and obtaining from Company all required Login Codes for such ACP to provide services as an Assigned ACP.

If a Client Application Opportunity required that the Assigned VSC ACP be subject to and comply with a non-compete obligation during the term of a SOW and/or for a specific period of time after the expiration or termination of the SOW, then a violation of the non-compete obligation as stated in the Opportunity and/or the SOW shall be deemed a material breach of both the MSA and the SOW and grounds for immediate termination of any and all agreements entered into by and between the VSC and Company.

During the Term of this SOW the VSC represents and warrants that the Assigned VSC ACP does not currently work directly for or provide any contracted services to Client's outsource vendors who provide ERS service.

VSC agrees that the Assigned VSC ACP shall maintain the same e-mail address provided during the opportunity enrollmen process through the expiration of the term of this SOW.

### 4. Service Level Requirements

VSC shall cause each Assigned ACP of the VSC to adhere to the following Service Level Requirements:

| Service Level Requirements | |
|---|---|
| Commitment Adherence (Schedule Release Ratio) | > = 90% |
| AUX | < = 5% |
| Ring No Answer*** | < = 4% |
| Priority Commitment | 100% |
| QA (% if scans meets or exceeds) | > = 85% |

| | |
|---|---|
| Q – 12 Member Satisfaction | > = 85% |
| NPS (Telephone Operator - Net Promoter Score) | > = 85% |
| Average Talk Time (ATT) | > = 225 and < = 265 seconds |
| Average Talk Time (AHT) | > = 245 and < = 285 seconds |
| Release Hours Restriction | During the service week (Sunday through Saturday) the Assigned ACP cannot release more than 25% of the total hours posted for that week. |
| Offer and Promote AAR/TRC and Hertz Rental Program to all members during TOW calls | 100% |

Failure to meet one or more of the Service Level Requirements by any Assigned VSC ACP shall be deemed a failure to perform and may subject this SOW to immediate termination by Company and/or the revocation or suspension of such Assigned VSC ACP's certifications by Company. Company may modify the Service Level Requirements specified herein, at any time, upon reasonable written prior notice to VSC.

With respect to the Service Level Requirement pertaining to Commitment Adherence, the following formula will be used to calculate such metric:

(Serviced minutes + Excused Non Serviced Minutes)/(posted minutes + released minutes)

For purposes of the above formula: "posted Minutes" shall equal the total number of minutes of Accepted Shift; "posted serviced" shall mean the total number of minutes of Accepted Shift actually serviced; and, "released" shall mean the total number of minutes of Accepted Shift that was not serviced or otherwise permitted by Company to release prior to the commencement of that particular Accepted Shift.

In the event that the Commitment Adherence percentage for any Assigned VSC ACP falls below 90% for 3 consecutive weeks or falls below 90% during any rolling 60 day period, in addition to any other remedies provided to the Company under this SOW or the Agreement, Company, at its sole discretion, shall have the right to disable the login codes ("Login Code Disabling Event") for this or any other Statement of Work that is outstanding between Company and VSC for a period of one (1) week to allow the VSC to implement whatever policies and/or controls that it deems necessary and appropriate to enable the VSC to meet its Commitment Adherence obligations.

In the event that within any rolling four (4) month period following a Login Code Disabling Event, VSC again sustains a Login Code Disabling Event, the Company shall terminate this SOW and shall also have the right to terminate any other outstanding Statements of Work and/or the Agreement.

Each Assigned VSC ACP who has had their certification revoked twice within a 4 month rolling window due to their materially deficient Commitment Adherence percentage may be subject to having his or her Arise Certified Professional certification permanently revoked by Company and VSC is subject to having this SOW and/or the Agreement terminated by Company.

VSC shall, and cause its Assigned ACPs to, fully cooperate with Company and its Assigned ACPs in connection with VSC's rendition of services under this SOW.

## 5. Term of SOW

This SOW shall commence on the **Effective Date** and shall expire **January 15, 2012**. VSC shall commence providing Accepted Shift service no later than two days from the Effective Date.

This SOW shall be subject to termination by any party prior to its expiration for breach of the terms of this SOW by the other party.

This SOW may be terminated immediately without cause upon request of the Client.

Notwithstanding anything to the contrary, this SOW shall automatically terminate upon the expiration or termination of the service agreement between the Company and the Client, or the expiration or termination of the statement of work entered between the Company and Client with respect to this Client Application. The Company shall provide VSC with as much advance notice as is reasonably practicable with respect to any such expiration or termination.

Termination from any other Client Application due to a material breach shall be deemed a material breach of this SOW and this SOW may be terminated at Company's sole discretion.

6. **VSC Service Fee**

   a. VSC shall be entitled to invoice and be paid a "Service Fee" on a semi-monthly basis (1st to the 15th and the 16th to the end of the month) (hereinafter the "Invoice Period(s)") for servicing its Accepted Shifts during the Invoice Period.

   b. The Service Fee that will be due to the VSC during an Invoice Period <u>shall be the greater of either the Base Service Fee or the Alternate Base Service Fee as defined below.</u>

   c. The amount of the "**Base Service Fee**" owed to the VSC for the Invoice Period shall be calculated using the base per call rate multiplied by the total number of calls serviced by the Assigned VSC ACP during the Invoice Period ("**Base Rate**"). The Base Per Call Rate is calculated based on Table 3 below.

| Metric | Base Per Call Rate |
|---|---|
| Commitment Adherence is = or > 90% and Quality is = or > 85% | $1.17 |
| Commitment Adherence is < 90% and/or Quality is < 85% | $1.05 |

Table 3

   d. Between the hours of Midnight and 9 am, Company may use the base service rate of **$10.00** per hour (the "**Alternate Base Rate**") multiplied by the total number of hours serviced by the Assigned VSC ACP during the Invoice Period, to determine the total amount of the Service Fee due to the VSC for the Invoice Period. Hereinafter this service fee shall be referred to as the "**Alternate Base Service Fee**".

   e. Definitions:

      a. Call Quality (QA): Shall mean the average of all call quality scores received from the 1st through the 15th and from the 1st through the end of the month as applicable.
      b. Commitment Adherence (CA%): Shall mean the Schedule Adherence minus Release Ratio, which shall be calculated as specified above in Section 4.

Note: To determine the Base Per Call Rate for the Invoice Period ending on the 15th, the Company will review the Commitment Adherence and Quality scores from the 1st through the 15th. To determine the Base Per Call Rate for the Invoice Period ending at the end of the month, the Company will review the Commitment Adherence and Quality scores from the 1st through the end of the month.

Notwithstanding the aforementioned, nothing stated here shall be interpreted or construed as a waiver of any right that Company may have to enforce the VSC's obligations to provide services under the Client Application in accordance with the terms of the Service Level Requirements set forth in Section 4.

Notwithstanding anything to the contrary herein, the following calls shall not be eligible for payment: (a) Any calls handled that were not within an Accepted Shift unless VSC received prior written permission from the Company to service a shift that is not an Accepted Shift; and (b) Any calls of a duration of thirty (30) seconds or less; or, any "System Abuse Calls", as hereinafter defined. "System Abuse Calls" shall mean any of the following: pre-maturely terminating calls; and, calls that are unnecessarily transferred to Client.

Notwithstanding anything to the contrary herein, with respect to the Base Rate or Alternate Base Rate, the following time **shall not** be included in determining the amount of hours of service provided by VSC during each semi-monthly Invoicing Period: time when any Assigned VSC ACP is on any Aux status for more than 5% of "total staffed time" as captured by the Company's systems. Aux statuses includes: On Break, No Answer, Authorized, Coaching, and ACW.

Company shall compute the payments that VSC is entitled for each payment period based on the call information captured by Company's data systems. Company shall provide such information per each payment period to VSC broken down by the aggregate number of calls that each Assigned VSC ACP serviced during each such payment period. One call may encompass all functions necessary to complete service to the AAA member. Functions such as outbound calls to the member and MSC support may be included in one call.

7.      **Representations and Warranties**

As a material inducement for Company to enter into this Agreement, VSC hereby represents and warrants to Company that all of the following are true and accurate:

1. That VSC has been duly incorporated under the Laws of the State of **Florida** ("State of Incorporation");
2. That VSC has made all of its required filings under its State of Incorporation and has not received notice from such state that the VSC has been dissolved or is delinquent in any required filings;
3. *That if the VSC's State of Incorporation is a state other than Florida, that* VSC is qualified to transact business in the State of Florida as a foreign corporation;
4. That the following individual or individuals each own at least 49% of the outstanding capital stock of VSC:  **Tina D Dowell** ; (each such individual defined as a "Principal Owner");
5. That the undersigned Principal Owner or Principal Owners shall be actively involved in the direction of the business of VSC and the performance of CSR services under this SOW;
6. That as of the Effective Date of this SOW, the following individual or individuals have been employed or contracted by the VSC for purposes of providing CSR services on behalf of the VSC under this SOW:  **Tina D Dowell** (each an "ACP");
7. That any ACP Assigned to provide services under this SOW to Client is authorized to work in the United States and is not subject to any Federal Watch list;
8. That VSC will be solely responsible to compensate and provide any benefits that may be required by law (including but not limited to workers' compensation and unemployment insurance) to any person employed by or deemed an Assigned ACP of VSC under the any federal or state law or regulation;
9. That any person or ACP employed by or assigned by VSC to service the Client shall not be eligible to participate in any benefit program maintained by Company or any client of Company;
10. That VSC's Assigned ACPs shall not be eligible to receive any unemployment benefits, workers compensation benefits, or any other type of benefits or insurance from Company or any client of Company;
11. That VSC represents and agrees that its Assigned ACPs hereby irrevocably waive any right: to assert a claim directly or indirectly against Company or any client of Company with respect to any of the benefits enumerated in paragraphs 8 through 11, above; or, to assert a claim with any governmental entity or any other third party seeking to hold Company or any client of Company liable for providing any of the benefits enumerated in paragraphs 8 through 10, above;

12. That as of the Effective Date of this SOW, each ACP employed or assigned by VSC to provide the Services described hereunder has signed:  a waiver in the form attached hereto as Exhibit "A" to the SOW, an employment agreement, if applicable, in the form set forth in Exhibit B to the Agreement, and a Non-Disclosure Agreement attached hereto as Exhibit B to this SOW and return to Company within fifteen (15) days of receipt;
13. That VSC warrants that the requirements set forth above, were previously satisfied and that VSC has complied with same by providing the executed documents set forth in Exhibit A, and Exhibit B of this SOW to Company, all in accordance with the terms of the Agreement and this SOW;
14. That VSC further agrees that Company and Client are third party beneficiaries of the Non-Disclosure agreement attached hereto as Exhibit B, and that a breach of the terms of Exhibit B, shall also be deemed a breach of this SOW and the Agreement, entitling Company to terminate this SOW and the Agreement and to take direct action to enforce the terms of the Non-Disclosure agreement;
15. That as of the Effective Date of this Agreement, the VSC has obtained workers compensation coverage for any CSR Assigned VSC ACP required to have such coverage under Florida law;
16. That VSC agrees on behalf of itself and all ACPs assigned by VSC, to comply with the terms of Section 6 of the Agreement "Protection of Confidential Information; Data Security", which is incorporate herein and made a part hereof by this reference as if fully set forth and that any violation of Section 6 by VSC or any of its Assigned ACPs shall be deemed a material breach of this SOW and the Agreement;
17. That VSC shall at all times be in compliance with and shall not violate any applicable federal, state and local laws, rules, regulations and ordinances, including, but not limited to (if applicable), the Federal Telephone Consumer Protection Act of 1991, the Federal Consumer Fraud and Abuse Prevention Act of 1994, the Telemarketing and Consumer Fraud and Abuse Prevention Act, as amended;
18. That VSC represents and warrants that all Services provided under this SOW shall be performed from within the United States; and,
19. That all Assigned VSC ACPs shall access Client's customer data only to provide the Services, and shall not disclose it to any third persons.

By entering into this SOW, Company has relied on the accuracy of the above affirmative representations and warranties. Failure to comply with any of the affirmative representations and warranties set forth herein or in the MSA, will be deemed a material breach of the terms of this SOW and the MSA, entitling Company to terminate this SOW and/or the MSA without further notice or liability.

**8.      Terms of Certification**

VSC warrants that the Assigned VSC ACP providing Services under this SOW has taken and passed ACP 101 and the applicable Client Certification Course.  In addition, the VSC acknowledges and agrees to the following conditions which shall apply to all certifications granted to any  Assigned VSC ACP hereunder: (i) Company is the sole certifying authority and therefore, the granting of any certification to an Assigned VSC ACP, lies solely within Company's determination that the  Assigned VSC ACP has complied with all of the certification requirements set by Company, (ii)  all certifications have a period of duration of twelve (12) months (the "Certification Period") and must be renewed by the  Assigned VSC ACP upon expiration of the applicable Certification Period (iii) the certification requirements applicable to any existing certification granted hereunder may be modified by Company,  at its sole discretion, at any time during the Certification Period, without prior notice to the VSC, and (iv)  as a general condition for renewal and maintaining any certification granted hereunder, all VSCs shall ensure that their Assigned VSC ACPs shall comply with all continuing certification education requirements set by Company, to include the successful completion of any courses provided and made available by Company to the VSCs, for the purpose of enhancing and updating skills related to any certification held by any Assigned VSC ACP.

There is an expectation that all Assigned VSC ACPs will perform their own work on all assignments and take exams with honor, integrity and professionalism.  Company has a "zero tolerance" for cheating.  Cheating includes but is not limited to (1) someone other than the Assigned VSC ACP attending the Certification Class on behalf of the Assigned VSC ACP, (2) publishing in any manner, whether written or oral, assignments, projects, exam questions or results, and (3) submission of assignments or exams that is not the work of the Assigned VSC ACP.  The decision as to whether an Assigned VSC ACP has cheated is at the sole discretion of Company.  Upon a determination of cheating, this SOW shall be terminated immediately, and the Assigned VSC ACP shall be expelled from the Certification Class.  Any Assigned VSC ACP caught cheating will be permanently removed from the Company network.

**9.      Arbitration of Claims**

Company and  VSC, on behalf of itself and all of the VSC's employees and  VSC's Assigned ACPs (for purposes of this clause all of the aforementioned shall be collectively referred to herein as "VSC"), hereby agree to resolve any and all disputes or claims each may have against the other by binding arbitration pursuant to either the then-current Commercial Arbitration Rules and Mediation Procedures or the then-current Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association (the "AAA").  Company and VSC agree that the Arbitration shall be conducted solely in Broward County, Florida, and therefore waive any objections or claims they might otherwise be able to rightfully assert based upon the inconvenience of the forum or improper jurisdiction. The nature of the claims asserted shall determine which body of rules will apply.  In the event that there is a dispute regarding which rules apply, the AAA shall decide that issue.  Both sets of rules are available for review at www.adr.org.  All parties to this Agreement expressly agree that the Federal Arbitration Act governs the enforceability of any and all of the arbitration provisions of this Agreement and judgment upon the award rendered by the arbitrator may be entered by any court of competent jurisdiction. Questions of abitrability (that is whether an issue is subject to arbitration under this Agreement) shall be decided by the arbitrator.  Procedural questions arising out of the dispute and bearing on its final disposition are matters for the arbitrator to decide. Claims must be filed within the time set by the applicable statute(s) of limitations.  By signing this Agreement, all parties waive their right to commence, to become a party to, or to remain a participant in, any group, class, collective, or hybrid class/collective action in any court against one or more other parties to this Agreement.  Further, the parties waive their right to commence, to become a party to, or to remain a participant in, any group, class, collective, or hybrid class/collective action claim in arbitration or any other forum. The parties agree that any claim by or against any other party to this Agreement shall be heard without consolidation of such claim with any other person or entity's claim.  All parties agree that this Agreement does not limit any party's right to initiate an action in state or federal court challenging the enforceability of the group, class, collective, or hybrid action waiver set forth herein. If any party chooses to exercise that right, Company will not retaliate against that party for doing so.  Company reserves the right to oppose such a challenge to enforcement of this Agreement.  The parties further agree that nothing in this Agreement precludes any party from participating in proceedings to adjudicate unfair labor practice charges before the National Labor Relations Board, including without limitation charges addressing the enforcement of the group, class, collective, or hybrid action waiver set forth herein. Either party's failure to comply with the terms set for here and those set forth in Section 11 of the MSA will deemed a material breach of the Agreement.

**10.     Amendment of Terms**

Company reserves the right to amend the terms of this SOW upon reasonable written notice to the VSC, unless such notice becomes impractical due to exigent (i.e. emergencies) circumstances.  The "Amendment" shall be deemed accepted by the VSC

unless VSC sends written notice of termination of the SOW, within ten (10) days of VSC's receipt of the notice of amendment from Company indicating that the Amendment is not acceptable to VSC and that VSC intends to terminate the SOW. Notwithstanding the aforementioned, Company reserves the right, at any time and without prior notice to VSC, to amend the terms of this SOW or change any of the procedures or policies set forth herein, which the Company determines in it's sole discretion may be required to comply with its internal security policies, or with any federal or state law, rule or regulation.

**11. Notice**

Any notice that is required to be provided by the parties herein may be provided by e-mail, in addition to the notice procedures set forth in the Arise-Virtual Services Corporation Master Services Agreement.

**In witness whereof**, the parties have duly executed and delivered this Agreement.

F W Dowell INC

By: *Tina D Dowell*

Title: Vice President

Arise Virtual Solutions Inc.

By: *Jared Fletcher*

Title: Director

**EXHIBIT A**
**WAIVER OF ASSIGNED VSC ACP IN FAVOR OF THE VIRTUAL SERVICES CORPORATION**

<u>Instructions</u>: The VSC must return Waiver executed by each of its Assigned ACP(s) to Company within fifteen (15) days of receipt.

As a material inducement for, and in consideration of, F W Dowell INC (the "Virtual Services Corporation") agreeing to employ or assign Tina D Dowell (the "Assigned VSC ACP"), agrees to ensure that each Assigned VSC ACP acknowledges and agrees as follows:

1. It is solely the responsibility of VSC to compensate and provide any benefits that may be required by law (including but not limited to workers' compensation and unemployment insurance) to Assigned VSC ACP.
2. Assigned VSC ACP shall not be eligible to participate in any benefit program maintained by Company or any client of Company.
3. Assigned VSC ACP shall not be eligible to receive any unemployment benefits, workers compensation benefits, or any other type of benefits or insurance from Company or any client of Company.
4. Assigned VSC ACP hereby irrevocably waives any right: to assert a claim directly or indirectly against Company or any client of Company with respect to any of the benefits enumerated in paragraphs 1 through 3, above; or, to assert a claim with any governmental entity or any other third party seeking to hold Company or any client of Company liable for providing any of the benefits enumerated in paragraphs 1 through 3, above.
5. Company and any client of Company shall be deemed to be a third party beneficiary of this Waiver Agreement and each of them shall jointly and/or severally have the right to enforce this Waiver Agreement against Assigned VSC ACP.
6. Any action that is contrary to the representations of the waiver provided herein shall be deemed a material breach of the applicable Statement of Work and may result in Company terminating the VSC's Statement of Work and the VSC's Master Services Agreement.
7. In the event that the undersigned files an unemployment claim, a copy of the waivers made herein shall be provided to the agency for which a claim is filed by the undersigned.
8. All obligations and rights herein shall survive beyond the termination, cancellation or expiration of the Master Services Agreement or a Statement of Work, irrespective of the cause and shall apply to any and all Client Applications serviced by the Assigned ACP.

Signed this _____ day of _____, 20__.

ASSIGNED VSC ACP SIGNATURE: _____     ACP ID:_____

ASSIGNED VSC ACP PRINT NAME: _____

**EXHIBIT B**

**NON-DISCLOSURE AGREEMENT**

<u>Instructions</u>: The VSC must return a Non-Disclosure Agreement that has been executed by each of its Assigned ACPs to Company within fifteen (15) days of receipt.

Agreement (the "Agreement") between F W Dowell INC (the "Virtual Services Corporation") and Tina D Dowell (the "Assigned VSC ACP"), effective _____, 20____.

WHEREAS, for the purpose as stated in Section 2 below, the VSC and the Assigned VSC ACP (collectively referred to as the "Parties" and individually referred to as a "Party") have determined to establish terms governing the use and protection of Confidential Information (as defined in Section 1 below) that the VSC may disclose to the Assigned VSC ACP.

WHEREAS, Assigned VSC ACP has been assigned by VSC to service the Client Application under the terms the Statement of Work for the Client Application, executed by and between Company and VSC, dated _____ ___, 20__.

NOW, THEREFORE, the Parties agree as follows:

1. "Confidential Information" means all information, materials, documentation and data furnished and disclosed by the VSC, Company or Client to the Assigned VSC ACP, whether in oral, written, graphic or machine-readable form, including but not limited to products and services, intellectual property, distribution channels, strategic alliances, marketing plans, software codes, designs, procedures, processing flowcharts, configurations, formulas, discoveries, inventions, improvements, concepts, ideas, customer lists, business plans, contacts and other business and technical information, except for such information and data as the parties agree in writing is not proprietary or confidential. Confidential Information shall also include information and materials in the VSC's possession, custody or control for any other person or entity that the Virtual Services Corporation is obligated to treat as confidential or proprietary. The term "Affiliate" means any person or entity directly or indirectly controlling, controlled by, or under common control with a Party.

2. The Assigned VSC ACP may use Confidential Information only for the benefit of the VSC and only while Assigned VSC ACP is employed to perform services for the VSC.

3. The Assigned VSC ACP agrees to hold in confidence and not disclose, reproduce, distribute, transmit, reverse engineer, decompile, disassemble, or transfer, directly or indirectly, in any form, by any means, or for any purpose, the Confidential Information or any portion thereof, without the prior written permission of the VSC.

4. The restrictions of this Agreement on use and disclosure of Confidential Information shall not apply to information that:

    (a)    Was publicly available at the time of the Virtual Services Corporation's communication thereof to the Assigned VSC ACP;

    (b)    Becomes publicly available through no fault of the Assigned VSC ACP subsequent to the time of the Virtual Services Corporation's communication thereof to the Assigned VSC ACP;

    (c)    Was in Assigned VSC ACP's possession free of any obligation of confidence at the time of the Virtual Services Corporation's communication thereof to the Assigned VSC ACP; provided, however, that the Assigned VSC ACP immediately informs the Virtual Services Corporation in writing to establish the Assigned VSC ACP's prior possession;

    (d)    Is developed by the Assigned VSC ACP independently of and without reference to any of the Virtual Services Corporation's Confidential Information or other information that the Virtual Services Corporation disclosed in confidence to any third party;

    (e)    Is rightfully obtained by the Assigned VSC ACP from third parties authorized to make such disclosure without restriction; or

    (f)    Is identified by the VSC as no longer proprietary or confidential.

5. In the event the Assigned VSC ACP is required by law, regulation or court order to disclose any of the VSCs Confidential Information, the Assigned VSC ACP will promptly notify the VSC in writing prior to making any such disclosure in order to facilitate the VSC seeking a protective order or other appropriate remedy from the proper authority. Assigned VSC ACP agrees to cooperate with the VSC in seeking such order or other remedy. Assigned VSC ACP further agrees that if the VSC is not successful in precluding the requesting legal body from requiring the disclosure of the Confidential Information, it will furnish only that portion of the Confidential Information, which is legally required and will exercise all reasonable efforts to obtain reliable assurances that confidential treatment will be accorded the Confidential Information.

6. All Confidential Information disclosed under this Agreement (including information in computer software held in electronic

storage media) shall be and remain the property of the VSC. All such information in tangible form shall be destroyed or returned to the VSC promptly upon written request or the termination or expiration of this Agreement, and shall not thereafter be retained in any form by the Assigned VSC ACP. All Confidential Information in any computer memory or data storage apparatus shall be erased or destroyed.

7.      This Agreement shall become effective as of the date first written above and shall automatically expire upon the termination of Assigned VSC ACP's employment with the VSC. Notwithstanding the termination of this Agreement for any reason whatsoever, all of the Assigned VSC ACP's non-disclosure obligations pursuant to this Agreement (and the VSC's rights and remedies with respect thereto) shall survive with respect to any Confidential Information received prior to such expiration or termination.

8.      The Assigned VSC ACP acknowledges that Confidential Information is unique and valuable, and that disclosure in breach of this Agreement will result in irreparable injury to the VSC for which monetary damages alone would not be an adequate remedy. Therefore, the Assigned VSC ACP agrees that in the event of a breach or threatened breach of confidentiality, the VSC will be entitled to specific performance and injunctive relief as a remedy for any such breach or anticipated breach without the necessity of posting a bond. Any such relief shall be in addition to and not in lieu of any appropriate relief in the way of monetary damages.

9.      VSC and Assigned VSC ACP agree that Company and Company's Client, as described in the SOW, are third party beneficiaries of this Non-Disclosure Agreement and that Company or Client shall have the right to the remedies and to take any of the actions described in Section 8 herein above, against Assigned VSC ACP to enforce the terms of the Non-Disclosure Agreement, due to Assigned VSC ACP's breach or improper disclosure of any Company or Client Confidential Information or data in violation of the terms hereof.

10.     No failure or delay in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege hereunder.

11.     This Agreement: (a) is the complete agreement of the Parties concerning the subject matter hereof and supersedes any prior agreements with respect to further disclosures concerning such subject matter; (b) may not be amended or in any manner modified except by a written instrument signed by authorized representatives of both Parties; and (c) shall be governed and construed in accordance with the laws of the State of Florida without regard to principles of conflicts of laws.

12.     If any action is brought for the enforcement of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with any provision of this Agreement, the successful or prevailing party shall be entitled to recover reasonable attorney's fees, costs and all expenses even if not taxable as court costs (including, without limitation, all such fees, costs and expenses incident to appellate, and bankruptcy proceedings), incurred in that action, in addition to any other relief to which such party or parties may be entitled. Attorney's fees shall include, without limitation, paralegal fees, investigative fees, administrative costs, sales and use taxes and all other charges billed by the attorney to the prevailing party.

13.     If any provision of this Agreement is found to be unenforceable, the remainder shall be enforced as fully as possible and the unenforceable provision shall be deemed modified to the limited extent required to permit its enforcement in a manner most closely representing the intention of the Parties as expressed herein.

14.     Any third party who supplied Confidential Information to the VSC shall be deemed to be a third party beneficiary of this Agreement in the event of any breach of this Agreement by the Assigned VSC ACP with respect to such Confidential Information.

        **IN WITNESS WHEREOF**, each of the Parties hereto has caused this Agreement to be executed by its duly authorized representative.

**VIRTUAL SERVICES CORPORATION**          **ASSIGNED VSC ACP**

By: _____          By: _____

Case 0:12-cv-61947-KAM   Document 1   Entered on FLSD Docket 10/03/2012   Page 69 of 74

## STATEMENT OF WORK TO THE MASTER SERVICES AGREEMENT
## AAA MSC NCNU_AZ PROGRAM

This Statement of Work to the Master Services Agreement (the "SOW") is entered as of **September 1, 2012** (the "Effective Date"), between F W Dowell INC ("Company") and Arise Virtual Solutions Inc. ("Arise").

Capitalized terms used in this SOW shall have the meaning as defined in that certain Master Services Agreement ("Agreement") entered between Company and Arise, including all exhibits and schedules thereto, unless otherwise defined in this SOW.

Company and Arise agree that this SOW shall be incorporated by reference, and become a part of the Agreement effective the Effective Date.

The term "Client" in this SOW shall mean AAA MSC.

The term "Client Program" shall mean the AAA MSC NCNU_AZ program.

The term "CSP Affiliate" shall mean a CSP employed by or otherwise affiliated with Company who has successfully completed a Client Certification Course and is identified by Company as a CSP Affiliate to provide CSR Services on a Client's Program under an active SOW.

The term "Client Support Professional" or "CSP" for purposes of this SOW shall have the same meaning as the term "CyberAgent" and "Arise Certified Professional" or "ACP" as that term is defined in the Agreement, if applicable.

The term "Independent Business" for purposes of this SOW shall have the same meaning as the term "CyberCorp" or "Virtual Services Corporation" or "VSC" as that term is defined in the Agreement, if applicable.

## 1.    Description of Program

Arise desires to engage Company, and Company desires to be engaged by Arise, to handle the following type of call: inbound customer service calls.

## 2.    Selection of Service Intervals

Arise shall post service interval opportunities electronically in half hour intervals on its proprietary scheduling system ("StarMatic®"). Such service intervals shall only be accepted by Company in the name of the CSP Affiliate that has been assigned by Company to actually service any such service intervals. Once Company selects service intervals to service ("Accepted Intervals"), Company shall cause the CSP Affiliate that Company has assigned to the interval to be available for CSR Service and shall ensure that the CSP Affiliate services such Accepted Intervals. Arise, at its sole discretion, may agree to release Company from its commitment to service any Accepted Interval for good cause shown by Company. No such release shall be effective unless provided by Arise to Company in writing prior to the commencement of such Accepted Interval.

Company shall provide, per CSP Affiliate, at least **15 hours** of Accepted Intervals service per week during the term this SOW; unless, however, Arise is unable to provide Company with the opportunity to be scheduled for at least **15 hours** of Accepted Intervals serviced during any such week - - in which case Company shall schedule service for such lesser number of hours that are made available by Arise. **Five hours** of the **15 hours** of Accepted Intervals should be selected from the following interval opportunities: **any posted service intervals on Sunday and/or Saturday**. For the Select Dates stated in Table 1 below, the **Minimum Hour Requirement** must be serviced on those days.

| Minimum Hour Requirement | Select Dates |
|---|---|
| Ten (10) hours | September 1st, 2nd, 3rd and/or 4th |
| Seven and one- half (7.5) hours | November 21st, 22nd and/or 23rd |
| Seven and one- half (7.5) hours | December 24th, 25th and or 26th |
| Seven and one- half (7.5) hours | December 31st, January 1st and/or January 2nd |

Table 1

EXHIBIT "B"

Arise reserves the right to remove, at its discretion; Accepted Intervals that become unnecessary due to a decrease in Client's call volume.

**3.    CSP Affiliate**

The following CSP Affiliate has been assigned by Company to provide Services on the Client's Program under this SOW: Tina D Dowell. Company shall not assign any other CSP Affiliate without first notifying Arise in writing of the name of such CSP Affiliate and obtaining from Arise all required Login Codes for such CSP Affiliate to provide services.

If a Client Program Opportunity required that the CSP Affiliate be subject to and comply with a non-compete obligation during the term of a SOW and/or for a specific period of time after the expiration or termination of the SOW, then a violation of the non-compete obligation as stated in the Opportunity and/or the SOW shall be deemed a material breach of both the MSA and the SOW and grounds for immediate termination of any and all agreements entered into by and between Company and Arise.

During the Term of this SOW, the Company represents and warrants that the CSP Affiliate does not currently work directly for or provide any contracted services to Client's outsource vendors who provide ERS service.

Company agrees that the CSP Affiliate shall maintain the same e-mail address provided during the opportunity enrollment process through the expiration of the term of this SOW.

**4.    Requirements**

The requirements shall consist of the Performance Requirements and Service Level Requirements set forth in the tables below ("Requirements"). Company shall ensure that its Designated CSP Affiliate complies with the following Requirements during the term of this SOW:

**4.1    Performance Requirements.**

| Performance Requirements | |
|---|---|
| QA | 85% |
| Auto Approved Repair | 8% - 10% |
| Q – 12 Member Satisfaction | > = 85% |
| Telephone Operator - Net Promoter Score (NPS) | > = 85% |
| Average Handle Time (AHT) | > = 245 and < = 285 seconds |
| Offer and Promote AAR/TRC and Hertz Rental Program to all members during TOW calls | 100% |
| Average Talk Time | Between 225 – 265 seconds |

**4.2    Service Level Requirements.**

| Service Level Requirements | |
|---|---|
| AUX | < = 5% |
| Ring No Answer | < = 4% |
| Priority Commitment | 100% |
| Commitment Adherence | 90% |
| Release Ratio | 9.99% |
| Release Hours Restriction | During the service week (Sunday through Saturday) the CSP Affiliate cannot release more than 25% of the total hours posted for that week. |

Arise may modify the Requirements specified herein, at any time, upon reasonable written prior notice to Company.

Arise shall have the right, at its sole discretion, to terminate this SOW and/or to revoke or suspend a CSP Affiliate's certification, if Company's assigned CSP Affiliate fails to meet one or more of the Requirements. With respect to the Requirement pertaining to Commitment Adherence, the following formula will be used to calculate this metric.

[Service Minutes/(Service Minutes + Released Lockdown Minutes)] x 100 = Commitment Adherence Percentage

For purposes of the above formula:

- "Serviced Minutes" shall mean the total number of minutes of each Accepted Interval that were actually serviced by the Company.
- "Released Lockdown Minutes" shall mean the total number of minutes of each Accepted Interval that were released within 48 hours of the commencement of that particular Accepted Interval. Minutes of an Accepted Interval that have been "swapped" in Starmatic® and serviced by another CSP shall not be deemed Released Lockdown Minutes.

In the event that the Commitment Adherence percentage for any CSP Affiliate falls below 90% for three consecutive weeks or falls below 90% during any rolling 60 day period, in addition to any other remedies provided to Arise under this SOW or the Agreement, Arise, at its sole discretion, shall have the right to disable the login codes ("Login Code Disabling Event") for this or any other SOW that is outstanding between Arise and Company under this Client Program for a period of one week. This will allow the Company to implement whatever policies and/or controls that it deems necessary and appropriate to enable the Company to meet its Commitment Adherence obligations.

Following a Login Code Disabling Event, Arise shall have the right to terminate this SOW and any other outstanding SOW Company may have in effect under this Client Program, if Company at any time during the term of this SOW, subsequently fails to meet the specified Commitment Adherence requirements set forth here above.

## 5.     Term of SOW

This SOW shall commence on the **Effective Date** and shall expire **January 15, 2013**. Company shall commence providing Accepted Intervals service no later than two days from the Effective Date.

This SOW shall be subject to termination by any party prior to its expiration for breach of the terms of this SOW by the other party.

Notwithstanding anything to the contrary, this SOW shall automatically terminate upon the expiration or termination of the service agreement between Arise and the Client, or the expiration or termination of the statement of work entered between Arise and Client with respect to this Client Program. Arise shall provide Company with as much advance notice as is reasonably practicable with respect to any such expiration or termination.

Termination from any other Client Program due to a material breach shall be deemed a material breach of this SOW and this SOW may be terminated at Arise's sole discretion.

## 6.     Company Revenue

a.   Company shall be entitled to invoice and be paid "Service Revenue" on a semi-monthly basis (1st to the 15th and the 16th to the end of the month) (hereinafter the "Invoice Period(s)") for servicing its Accepted Intervals during the Invoice Period.

b.   The Service Revenue that will be due to Company during an Invoice Period shall be the greater of either the Base Service Revenue or the Alternated Base Service Revenue as defined below.

   i.   The amount of the **"Base Service Revenue"** owed to Company for the Invoice Period shall be calculated using the base per call rate multiplied by the total number of calls serviced by the CSP Affiliate during the Invoice Period ("**Base Rate**"). The Base Per Call Rate is calculated based on Table 2 below.

| Metric | Base Per Call Rate |
|---|---|
| Commitment Adherence is = or > 90% and Quality is = or > 85% | $1.17 |
| Commitment Adherence is < 90% and/or Quality is < 85% | $1.05 |

Table 2

   ii.   Between the hours of Midnight and 9 am, Arise may use the base service rate of **$10.00** per hour (the "**Alternate Base Rate**") multiplied by the total number of hours serviced by the CSP Affiliate during the Invoice Period, to determine the total amount of the Service Revenue due to the Company for the Invoice Period. Hereinafter this service revenue shall be referred to as the "**Alternate Base Service Revenue**".

c.   Definitions:

   1.   "After Call Work (ACW)" shall mean the amount of time spent completing work associated with a call or customer contact after the call or customer contact has been completed.
   2.   "Average Handle Time (AHT)" shall mean the total amount of time that Company spent on the telephone with the Client's customer including After Call Work, and hold time divided by the total number of calls handled for the Invoicing Period.
   3.   "Average Talk Time (ATT)" shall mean the average amount of time that a Company spends on an inbound customer contact.
   4.   "Call Quality (QA)" shall mean the average of all call quality scores received for the Invoicing Period.
   5.   "Commitment Adherence (CA%)" shall mean the Schedule Adherence minus Release Ratio, which shall be calculated as specified above in Section 4.

Notwithstanding the aforementioned, nothing stated here shall be interpreted or construed as a waiver of any right that Arise

Case 0:12-cv-61947-KAM   Document 1   Entered on FLSD Docket 10/03/2012   Page 72 of 74

may have to enforce the Company's obligations to provide services under the Client Program in accordance with the terms of the Requirements set forth in Section 4.

Notwithstanding anything to the contrary herein, the following calls shall not be eligible for payment: (a) Any calls handled that were not within an Accepted Interval unless Company received prior written permission from Arise to service an interval that is not an Accepted Interval; and (b) Any calls of a duration of 30 seconds or less; or, any "System Abuse Calls", as hereinafter defined. "System Abuse Calls" shall mean any of the following: pre-maturely terminating calls; and, calls that are unnecessarily transferred to Client.

Notwithstanding anything to the contrary herein, the following time **shall not** be included in determining the amount of hours of service provided by Company during each semi-monthly Invoicing Period: time when any CSP Affiliate is "on-break status" as captured by Arise's systems; time when any CSP Affiliate is on "After Call Work" as captured by Arise's systems; and, time when any CSP Affiliate is in "no-answer status" as captured by Arise's systems.

Arise shall compute the payments that Company is entitled for each payment period based on the call information captured by Arise's data systems. Arise shall provide such information per each payment period to Company broken down by the aggregate number of calls that each CSP Affiliate serviced during each such payment period.

**7.    Company Representations and Warranties**

As a material inducement for Arise to enter into this Agreement, Company hereby represents and warrants to Arise that all of the following are true and accurate:

1. That Company has been duly incorporated under the Laws of the State of **Florida** ("State of Incorporation").
2. That Company has made all of its required filings under its State of Incorporation and has not received notice from such state that Company has been dissolved or is delinquent in any required filings.
3. *That if Company's State of Incorporation is a state other than Florida,* Company is qualified to transact business in the State of Florida as a foreign corporation.
4. That the following individual each owns at least 49% of the outstanding capital stock of Company: **Tina D Dowell**; (each such individual defined as an "Independent Business Owner").
5. That the Independent Business Owner is actively involved in the direction of the business and the performance of CSR services under this SOW.
6. That as of the Effective Date of this SOW, the following individual has been employed or contracted by the Company for purposes of providing CSR Services on behalf of the Company under this SOW: Tina D Dowell (each a "CSP").
7. That any CSP providing services hereunder is authorized to work in the United States and not subject to any Federal Watch list.
8. That Company is solely responsible to compensate and provide any benefits that may be required by law (including but not limited to workers' compensation and unemployment insurance) to any person employed by or deemed to be an employee of Company under any federal or state law or regulation.
9. That CSP Affiliate shall not be eligible to participate in any benefit program maintained by Arise or any client of Arise.
10. That CSP Affiliate shall not be eligible to receive any unemployment benefits, workers compensation benefits, or any other type of benefits or insurance from Arise or any client of Arise.
11. That CSP Affiliate hereby irrevocably waive any right: to assert a claim directly or indirectly against Arise or any client of Arise with respect to any of the benefits enumerated in paragraphs 8 through 10, above; or, to assert a claim with any governmental entity or any other third party seeking to hold Arise or any client of Arise liable for providing any of such benefits.

12. That as of the Effective Date if this SOW, Company has obtained workers compensation coverage for every CSP Affiliate required have such coverage under Florida law.
13. That Company agrees on behalf of itself and all of its CSP Affiliates, to comply with the terms of Section 6 of the Agreement "Protection of Confidential Information; Data Security", which is incorporated herein and made a part hereof by this reference as if fully set forth and that any violation of Section 6 by Company or any of its CSP Affiliates shall be deemed a material breach of this SOW and the Agreement.
14. Company shall at all times be in compliance with and shall not violate any applicable federal, state and local laws, rules, regulations and ordinances, including, but not limited to (if applicable), the Federal Telephone Consumer Protection Act of 1991, the Federal Consumer Fraud and Abuse Prevention Act of 1994, the Telemarketing and Consumer Fraud and Abuse Prevention Act, as amended.

15. That Company represents and warrants that all Services provided under this SOW shall be performed within the United States.
16. That all CSP Affiliate(s) shall access Client's customer data only to provide the CSR Services, and shall not disclose it to any third persons.
By entering into this SOW, Arise has relied on the accuracy of the above affirmative representations and warranties. Failure to comply with any of the affirmative representations and warranties set forth here or in the Agreement, will be deemed a material breach of the terms of this SOW, entitling **Arise** to terminate this SOW and/or the MSA without further notice or liability.

**8.     Terms of Certification**

Company warrants that the CSP Affiliate providing services under this SOW has taken and passed CSP 101 (formerly known as "ACP 101") and the applicable Client Certification Course. In addition, Company acknowledges and agrees to the following conditions which shall apply to all certifications granted to any CSP Affiliate hereunder: (i) Arise is the sole certifying authority and therefore, the granting of any certification to a CSP Affiliate, lies solely within Arise's determination that the CSP Affiliate has complied with all of the certification requirements set by Arise, (ii) all certifications have a period of duration of 12 months (the "Certification Period") and must be renewed by the CSP Affiliate upon expiration of the applicable Certification Period (iii) the certification requirements applicable to any existing certification granted hereunder may be modified by Arise, at its sole discretion, at any time during the Certification Period, without prior notice to the Company, and (iv) as a general condition for renewal and maintaining any certification granted hereunder, Company shall ensure that CSP Affiliate(s) shall comply with all continuing certification education requirements set by Arise, to include the successful completion of any courses provided and made available by Arise to the Company, for the purpose of enhancing and updating skills related to any certification held by the CSP Affiliate.

There is an expectation that all CSP Affiliates will perform their own work on all assignments and take exams with honor, integrity and professionalism. Arise has a "zero tolerance" for cheating. Cheating includes but is not limited to (1) someone other than the CSP Affiliate attending the Certification Class on behalf of the CSP Affiliate, (2) publishing in any manner, whether written or oral, assignments, projects, exam questions or results, and (3) submission of assignments or exams that is not the work of the CSP Affiliate. The decision as to whether a CSP Affiliate has cheated is at the sole discretion of Arise. Upon a determination of cheating, this SOW shall be terminated immediately, and the CSP Affiliate shall be expelled from the Certification Class. Any CSP Affiliate caught cheating will be permanently removed from Arise network.

**9.     Arbitration of Claims; Class Action Waiver**

9.1     Arise and Company, on behalf of itself and all of Company's employees and CSPs, hereby agree to resolve any and all disputes or claims each may have against the other, or against any Arise Client, by binding arbitration pursuant to either the then-current Commercial Arbitration Rules and Mediation Procedures or the then-current Employment Arbitration Rules and Mediation Procedures of the American Arbitration Association (the "AAA"). Arise and Company agree that the arbitration shall be conducted by a single arbitrator in the AAA office nearest the claimant (or such other location as is mutually agreed to by the parties), and therefore waive any objections or claims they might otherwise be able to rightfully assert based upon the inconvenience of the forum or improper jurisdiction. Unless otherwise mutually agreed, the arbitrator shall be a practicing attorney with at least 15 years of experience and at least five years of experience as an arbitrator. The nature of the claims asserted shall determine which body of rules will apply. In the event that there is a dispute regarding which rules apply, the AAA shall decide that issue. Both sets of rules are available for review at www.adr.org.

9.2     All parties to this SOW expressly agree that the Federal Arbitration Act governs the enforceability of any and all of the arbitration provisions of this SOW and judgment upon the award rendered by the arbitrator may be entered by any court of competent jurisdiction. Questions of arbitrability (that is whether an issue is subject to arbitration under this SOW) shall be decided by the arbitrator. Procedural questions arising out of the dispute and bearing on its final disposition are matters for the arbitrator to decide. Claims must be filed within the time set by the applicable statute(s) of limitations.

9.3     Either party may apply to the arbitrator seeking injunctive relief until the arbitration award is rendered or the controversy is otherwise resolved pursuant to the Optional Rules for Emergency Measures of Protection of the AAA. Either party also, may without waiving any remedy under this SOW, seek from any court having jurisdiction any interim or provisional relief that is necessary to protect the rights of property of that party, pending the establishment of the arbitral tribunal (or pending the arbitral tribunal's determination of the merits of the controversy).

9.4     **Class Action Waiver.** By signing this SOW, all parties waive their right to commence, to become a party to, or to remain a participant in, any group, representative, class, collective, or hybrid class/collective action in any court against one or more other parties to this SOW, or any Arise Client. Further, the parties waive their right to commence, to become a party to, or to remain a participant in, any group, representative, class, collective, or hybrid class/collective action claim in arbitration or any other forum against one or more parties to this SOW or any Arise Client. The parties agree that any claim by or against any other party to this SOW or any Arise Client shall be heard in arbitration without consolidation of such claim with any other person or entity's claim. All parties agree that this SOW does not limit any party's right to initiate an action in state or federal court challenging the enforceability of the group, representative, class, collective, or hybrid action waiver set forth herein. If Company chooses to exercise that right, Arise will not retaliate against Company for doing so. Arise reserves the right to oppose such a challenge to enforcement of this SOW. The parties further agree that nothing in this SOW precludes any party from participating in proceedings to adjudicate unfair labor practice charges before the National Labor Relations Board, including without limitation charges addressing the enforcement of the group, representative, class, collective, or hybrid action waiver set forth herein. Either party's failure to comply with the terms set for herein will deemed a material breach of the Agreement.

9.5     If any part of this Section 9, other than the waiver pursuant to Section 9.4 of the right to commence, to become a party to, or to remain a participant in, any group, representative, class, collective, or hybrid class/collective action in any court against one or more other parties to this SOW, or any Arise Client, is deemed or found to be unenforceable for any reason, the remainder of the arbitration clause is severable and shall remain enforceable. If a waiver of the rights pursuant to Section 9.4 is deemed or found to be unenforceable for any reason in a case in which class action or similar allegations have been made, the remainder of this Section 9 shall also be unenforceable.

## 10.    Amendment of Terms

Arise reserves the right to amend the terms of this SOW upon reasonable written notice to the Company, unless such notice becomes impractical due to exigent (i.e. emergencies) circumstances.  The "Amendment" shall be deemed accepted by the Company unless Company sends written notice of termination of the SOW, within ten days of Company's receipt of the notice of Amendment from Arise indicating that the Amendment is not acceptable to Company and that Company intends to terminate the SOW. Notwithstanding the aforementioned, Arise reserves the right, at any time and without prior notice to Company, to amend the terms of this SOW or change any of the procedures or policies set forth herein, which Arise determines in it's sole discretion may be required to comply with its internal security policies, or with any federal or state law, rule or regulation.

## 11.    Notice

Any notice that is required to be provided by the parties herein may be provided by e-mail, in addition to the notice procedures set forth in the Agreement.

**In witness whereof**, the parties have duly executed and delivered this Agreement.

F W Dowell INC

By:    *Tina D Dowell*

Title:    Vice President

Arise Virtual Solutions Inc.

By:    *Ken Jackowitz*

Title:    SVP, Independent Business Owner Operations